[Cite as *State v. Ransom*, 2024-Ohio-2634.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 113225 |
| v. | : | |
| DION RANSOM, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 11, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672376-C

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben O. McNair, Assistant Prosecuting Attorney, *for appellee.*

Susan J. Moran, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Dion Ransom ("Ransom"), appeals from his convictions following a bifurcated trial. He raises the following assignments of error for review:

1. The State was allowed to argue facts not in evidence, fatally prejudicing Mr. Ransom.

2. The State did not present sufficient evidence as to Count 14, murder (B) or the predicate offense, Count 18, felonious assault.

3. Mr. Ransom's convictions relied on the testimony of two witnesses that were shown to not be credible and are therefore against the manifest weight of the evidence.

4. Trial counsel was ineffective for failing to object to the State's presentation of cumulative, gruesome, and minimally probative photos to the prejudice of Mr. Ransom.

{¶ 2} After careful review of the record and relevant case law, we affirm Ransom's convictions and sentence.

## I. Procedural and Factual History

{¶ 3} On July 15, 2022, Ransom and his codefendants, Dacee Fisher ("Fisher"), Jimmy Wilborn ("Wilborn"), Esperanza Lugo ("Lugo"), and Veronica Washington ("Washington"), were named in a 43-count indictment, charging them with various criminal offenses relating to the shooting death of H.R. (d.o.b. 07/03/2003) on April 8, 2021.

{¶ 4} Relevant to this appeal, Ransom was named in 13 counts of the indictment and charged with aggravated murder in violation of R.C. 2903.01(A), with one- and three-year firearm specifications and a criminal gang activity specification (Count 2); aggravated murder in violation of R.C. 2903.01(B), with one- and three-year firearm specifications, and a criminal gang activity specification (Count 6); murder in violation of R.C. 2903.02(A), with one- and three-year firearm specifications, a criminal gang activity specification, and a repeat violent offender

specification (Count 10); murder in violation of R.C. 2903.02(B), with one- and three-year firearm specifications a criminal gang activity specification, and a repeat violent offender specification (Count 14); felonious assault in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications, a criminal gang activity specification, a repeat violent offender specification, and a notice of prior conviction specification (Count 18); improperly discharging into habitation in violation of R.C. 2923.161(A)(1), with one-, three-, and five-year firearm specifications, a criminal gang activity specification, a repeat violent offender specification, and a notice of prior conviction specification (Count 22); felonious assault in violation of R.C. 2903.11(A)(2), with one-, three-, and five-year firearm specifications, a criminal gang activity specification, a repeat violent offender specification, and a notice of prior conviction specification (Count 26); improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(A), with one-, three-, and five-year firearm specifications (Count 29); tampering with evidence in violation of R.C. 2921.12(A)(1) (Count 30); obstructing justice in violation of R.C. 2921.32(A)(5) (Count 34); participating in a criminal gang in violation of R.C. 2923.42(A), with one-, three-, and five-year firearm specifications (Count 36); involuntary manslaughter in violation of R.C. 2903.04(A), with one- and three-year firearm specifications, a criminal gang activity specification, a repeat violent offender specification, and a notice of prior conviction specification (Count 38); and having weapons while under disability in violation of R.C. 2923.13(A)(2), with one- and three-year firearm specifications (Count 41).

**{¶ 5}** During the pretrial process, codefendants Lugo and Washington entered into negotiated plea agreements with the State and pleaded guilty to reduced charges. Pursuant to the terms of their plea agreements, Lugo and Washington were required to cooperate with the State.

**{¶ 6}** Ransom entered pleas of not guilty, and the matter proceeded to a joint trial on August 2, 2023. With respect to Ransom, the parties agreed to try Counts 2, 6, 10, 14, 18, 22, 26, 29, 30, and 34 before a jury. Counts 36, 38, and 41, were tried separately to the bench. The repeat violent offender, notice of prior conviction, and criminal-gang activity specifications were also tried to the bench.

**{¶ 7}** Over the course of eight days, the State presented 24 witnesses and approximately 370 exhibits. The evidence adduced at trial demonstrated that on April 6, 2021, codefendants Fisher and Lugo befriended H.R. while visiting Edgewater Park in Cleveland, Ohio. Ultimately, Fisher invited H.R. to his apartment, located on Harvard Avenue in Cleveland, Ohio, where they spent the rest of the evening "smoking and drinking" together. (Tr. 1314.)

**{¶ 8}** The following day, Fisher drove H.R. and Lugo in his vehicle, a black Toyota SUV, to meet Ransom and Washington at a house party held at a residence located on Union Avenue. At some point that evening, Fisher and H.R. constructed a plan to complete an armed robbery at the residence of H.R.'s "boyfriend or ex-boyfriend," Duane Crawford ("Crawford") (Tr. 929, 1320-1323.) The plan was set in motion after H.R. disclosed to Fisher that Crawford's residence, which was located on East 108th Street, contained guns, cash, and credit cards. (Tr. 1323.) To facilitate

the robbery, Fisher contacted Wilborn, who was living in the Akron area, and asked him to drive to the Union Avenue address to discuss the plan in person. (Tr. 1322.) Lugo, who testified on behalf of the State, clarified that the idea to rob Crawford "started off as [H.R.'s] plan that she brought to [Fisher] and then it moved on from [Fisher] to [Wilborn] and [Ransom]." (Tr. 1321.)

{¶ 9} Lugo testified that she, Fisher, Wilborn, and H.R. left the Union Avenue residence after midnight and drove back to Fisher's residence on Harvard Avenue to "wait for the time that whoever we were supposed to rob was going to be home." (Tr. 1325.) To ascertain Crawford's whereabouts, H.R. sent Crawford a text message at 11:19 p.m. on April 7, 2021, to see what he was doing that evening. As the evening progressed, H.R. continued to send Crawford text messages, stating that she wanted to "talk to [him] about something," in person. (Tr. 480-483.)

{¶ 10} Ransom and Washington also left the Union Avenue residence after midnight. Washington, who was driving a red Ford Fusion, drove Ransom to an apartment complex located on East 40th Street. Ransom lived at the apartment complex with L.P., the mother of his child. Upon arriving at the apartment complex, Ransom went inside for an unspecified period of time while Washington fell asleep inside her vehicle. At approximately 1:22 a.m., Ransom sent a Facebook message to an unidentified woman, stating, "I left my phone at [Fisher's] house. I told you what we was on[.] Love you. Talk to you later." (Tr. 1567, State's exhibit No. 937.) Ransom later returned to Washington's vehicle with a large black duffel bag. (Tr. 922.)

{¶ 11} At approximately 4:35 a.m., Fisher, Lugo, Wilborn, and H.R. met Ransom and Washington at the East 40th apartment complex. (Tr. 1326; State's exhibit No. 803.) Shortly thereafter, the parties left the apartment complex and began driving to the Crawford residence. According to Washington, who testified on behalf of the State, Lugo was driving the black Toyota SUV with Fisher, Wilborn, and H.R. sitting in the passenger seats. (Tr. 1329.) Washington drove the red Ford Fusion with Ransom sitting in the front passenger's seat. The movements of each vehicle during the trip to Crawford residence were captured by city surveillance cameras and home security cameras. (State's exhibit No. 100.)

{¶ 12} A home security system captured the vehicles arriving near the Crawford residence at approximately 5:07 a.m. (Tr. 951; State's exhibit No. 100.) The parties drove their vehicles "up and down random streets" until H.R. was able to positively identify Crawford's residence. (Tr. 1330.) The parties then pulled around the corner from Crawford's residence and parked at the intersection of East 107th Street and Elk Avenue at approximately 5:12 a.m. (Tr. 927, 1330; State's exhibit No. 81, 100.) Thereafter, the parties remained near the parked vehicles while they contemplated "what they were going to do." (Tr. 925.)

{¶ 13} At some point, Fisher exited the black Toyota SUV to speak with Ransom. (Tr. 925.) During this conversation, Fisher stated that he believed H.R. "was setting them up" and that "he was going to kill her." (Tr. 928.) Washington maintained that she pleaded with Fisher to not kill "that girl." (*Id.*) Ransom, however, agreed with Fisher's assessment and stated that H.R. had to be killed. (*Id.*)

Fisher then returned to the black Toyota SUV and told H.R. to get out of the vehicle. Washington testified that Fisher and H.R. then "walked to the park like the best of friends and he shot her" twice, resulting in H.R.'s death. (Tr. 928-930.) Washington confirmed that she was able to hear and observe the gunshots from her parked vehicle.

{¶ 14} Lugo corroborated Washington's recollection of Fisher's movements prior to the shooting. Lugo stated that after Fisher completed his conversation with Ransom in Washington's vehicle, he

> came back to the Rav4 and opened the passenger side door. At that point I had [H.R.]'s number in my phone, [Fisher] tells me to stay by my phone. When everything was ready, that she would call me. He told [H.R.] to try to get [Crawford] to come outside and at that point we'll rush in. And they shut the door and they start walking towards the park.
>
> . . .
>
> After that, I heard two gunshots.
>
> . . .
>
> I see the gun shots.

(Tr. 1334.)

{¶ 15} Washington testified that after she witnessed Fisher shoot and kill H.R., her only thought was to drive away. Washington stated that she turned the corner to flee the scene when Ransom told her to slow down near Crawford's residence. Ransom then pulled a large rifle out of the black duffle bag and began shooting at Crawford's residence. Phone records indicate that the drive-by shooting of the Crawford residence occurred at approximately 5:20 a.m. (Tr. 1108.) Lugo also

testified that she observed bullets "coming from [Washington]'s car into the Crawford house." (Tr. 1335.)

{¶ 16} Crawford was not home during the shooting. However, his father and two brothers were sleeping inside the residence. The gunfire entered the residence and struck interior walls, but no one was injured. (Tr. 445.) Crawford's father testified that most of the gunshots entered the first floor of the residence, stating "it was about 20 or — maybe 20 or 30 bullet holes downstairs before they tried to — before they shot upstairs." (Tr. 447.) However, several bullets entered the upstairs bedroom where Crawford's father was sleeping at the time.

{¶ 17} Following the shootings, Lugo picked Fisher up in the black Toyota SUV and both vehicles fled the scene. Washington testified that she first drove Ransom back to the Union Avenue residence so that he could "dro[p] his gun off." (Tr. 935.) They later returned to the Harvard Avenue residence to meet back up with Fisher, Lugo, and Wilborn. (Tr. 936.)[1] When asked to describe her conversations with Ransom after the shootings, Washington testified that Ransom told her to "say nothing, keep [her] mouth closed, don't repeat nothing to nobody." (Tr. 958.)

{¶ 18} At 7:31 a.m., on April 8, 2021, Ransom sent a text message to L.P., stating: "I'm cool baby. Didn't go the way we wanted it to. I'm at [Fisher's] spot."

---

[1] Contrary to Washington's testimony, Lugo testified that Wilborn was also inside Washington's vehicle at the time of the drive-by shooting. (Tr. 1331 and 1336.) Wilborn's GPS monitor indicates that he was likely in the red Ford Fusion at approximately 5:09 a.m. when the parties were searching for the Crawford residence. (State's exhibit Nos. 100 and 805.)

(Tr. 1570; State's exhibit No. 930.)  Later that day, Fisher rented a car, and he, Ransom, Lugo, and Washington travelled to South Carolina, where they stayed for several days.  (Tr. 939.)

{¶ 19} H.R.'s body was discovered at approximately 12:00 p.m. on April 8, 2021.  Her body was examined at the scene by Dr. Joseph Felo ("Dr. Felo"), the Chief Deputy Medical Examiner for the Cuyahoga County Medical Examiner's Office. Dr. Felo testified that H.R.'s body was still warm and did not have significant insect activity.  Accordingly, he concluded that H.R. "had not been there for more than several hours [and] . . . most likely had died earlier that morning."  (Tr. 547.)

{¶ 20} Dr. Felo also performed H.R.'s autopsy.  He testified that H.R. sustained independently fatal gunshot wounds to her head and chest.  She also sustained a defensive gunshot wound to her left forearm.  (Tr. 566.)  Photographs of H.R.'s injuries were introduced while Dr. Felo explained his examination and the conclusions rendered in his autopsy report.  Based on the nature and significance of the observable injuries, Dr. Felo determined that H.R.'s cause of death was "gunshot wounds of head, thorax, and left lower arm with skeletal, brain, and left lung injuries."  (Tr. 571.)  Her manner of death was "categorized and classified as a homicide."  (*Id.*)

{¶ 21} Patrol Officer Patrick Wells ("Officer Wells") of the Cleveland Police Department responded to the Crawford residence on April 8, 2021, after receiving a dispatch for shots fired into a habitation.  (Tr. 1044.)  Upon arriving at the scene, Officer Wells observed twelve .223 shell casings and seven .380 shell casings near

the street. The shell casings were collected and submitted to the National Integrated Ballistic Information Network ("NIBIN"). (State's exhibit Nos. 95, 171, and 183.) However, the shell casings were not swabbed or submitted for DNA testing before they underwent ballistics testing. (Tr. 822.)

{¶ 22} Forensic scientist James Kooser ("Kooser"), of the Cuyahoga County Regional Forensic Science Laboratory, confirmed that all 12 of the .223 cartridge cases were fired from the same unknown firearm. (Tr. 1240.) However, Kooser could not recall whether he compared the .380 casings to determine whether they were fired from the same gun. (Tr. 1263, 1267.) On cross-examination, Kooser further admitted that on the morning of this direct examination, he learned that the spent shell casing discovered by the investigators during their execution of a search warrant in Ransom's apartment did not match the .223 casings found at the scene of the shooting. (Tr. 1257-1258.)

{¶ 23} Special Agent Cristin McCaskill ("Agent McCaskill") of the Federal Bureau of Investigation, testified that she is currently employed in the violent crimes unit and is tasked with assisting the Cleveland police in certain homicide investigations. In this case, Agent McCaskill and her colleague Special Agent Andrew Burke ("Agent Burke") responded to the location of H.R.'s body and attempted to "identify her using a mobile biometric application unit." (Tr. 700.) Unfortunately, the agents were unable to identify H.R. at the scene because she did not have a record in the system. Thereafter, the agents assisted detectives in

canvassing the neighborhood for eyewitness accounts, additional physical evidence, and security camera footage.

{¶ 24} Based on video footage recovered from nearby residences and the city of Cleveland, the investigators learned that multiple vehicles were involved in the shooting, including "a small black Rav4, and a red sedan which we later discovered was a Ford Fusion." (Tr. 707, 886.) Agent McCaskill testified that the black Toyota SUV was registered in the name of an individual that shared a listed address with Fisher. Using Cuyahoga County's "license plate reader system," the black Toyota SUV was discovered in a parking lot on April 13, 2021. (Tr. 888.) That same day, the police detained Fisher, which coincided with Ransom sending a Facebook message at 4:39 p.m. that day stating, "Police just got P Dup [Fisher]." (Tr. 1526 and 2011.)

{¶ 25} Following the police interview with Fisher, the police brought Lugo in for questioning. A follow-up interview was conducted a few days later that led to her being placed under arrest. (Tr. 1445.) During her direct examination, Lugo admitted to lying to the police after she was brought in for questioning. Specifically, Lugo originally told the police that she dropped H.R. off at her cousin's house near East 108th Street and had no knowledge of what happened to her thereafter. She later stated that she "dropped [H.R.] off at St. Clair and Glenview and watched her go into a house." (Tr. 1380.) When the investigators insinuated that they knew she was lying, Lugo finally conceded that there was a second vehicle involved, although she claimed that she "had no clue" who was in the other vehicle. (Tr. 1411.)

Eventually, Lugo admitted during her proffer statement that she, H.R., Ransom, Washington, Wilborn, and Fisher drove to the East 108th Street address to complete a robbery that was planned by Fisher and H.R.

{¶ 26} Lugo maintained that she initially lied to the police because she was scared of "the guys who did the killing and shooting," and if "they did this to [H.R.], what were they going to do to [her]" if she cooperated. (Tr. 1348.) Lugo also conceded that she accepted a plea deal with the State and pleaded guilty to reduced charges in exchange for her testimony. Lugo had yet to be sentenced and was facing up to 18 years in prison. (Tr. 1350.)

{¶ 27} In October 2021, the investigators identified Washington as the driver of the red Ford Fusion. She was subsequently arrested on January 19, 2022. (Tr. 1447 and 1543.) Washington similarly admitted on direct examination that she was not truthful with the police following her arrest in January 2022. Like Lugo, Washington conceded that she provided five or six different versions of the incident before identifying Fisher and Ransom as the shooters. (Tr. 985-992.) Initially, Washington claimed that she did not know H.R. and had never met her. She later stated that she and Lugo dropped H.R. off near East 108th Street and never saw her again. Next, Washington "indicated that an unknown male, that [she] had never met before was the one who shot [H.R.]." (Tr. 991.) Washington then stated that Fisher was also at the scene and was the individual who shot into the Crawford residence. In version number five, Washington asserted that Fisher was responsible for H.R.'s shooting death and that the unknown male was responsible for the drive-

by shooting into the Crawford residence. Washington did not identify Ransom as the drive-by shooter until she provided her final version to the investigators after agreeing to cooperate with the State.

{¶ 28} Washington stated that she lied to the police to protect Ransom because she was pregnant and believed Ransom to be the father. Washington further conceded that she accepted a plea deal with the State and pleaded guilty to reduced charges in exchange for her testimony. At the time of Ransom's trial, Washington had yet to be sentenced and was facing two to eight years in prison. She has remained in jail since the time of her arrest and gave birth to her child while incarcerated.

{¶ 29} Shortly after her arrest, Washington contacted Ransom to tell him that she had been brought in for questioning and arrested. (Tr. 901.) On March 23, 2022, Ransom contacted a gunsmith, asking whether he had "a 556 NATO firing pin and attachments." (Tr. 1558, State's exhibit No. 935.) Agent Burke explained that the message indicated that Ransom was "looking to purchase specific parts of a rifle that would change those characteristics ballistically." (Tr. 1558.)

{¶ 30} Detective John Dayton ("Det. Dayton") of the Cleveland Police Department testified that Ransom was arrested in March 2022, after Washington linked him to the shooting. (Tr. 1450-1451.) At the time of his arrest, Ransom confirmed that he resided at the East 40th Street apartment with L.P. throughout 2021. (*Id.*) Ransom also admitted to knowing Fisher and Lugo but denied ever meeting H.R.

{¶ 31} The police seized two cell phones from Ransom. On one of his phones, there was a text message sent to Fisher on December 24, 2020. (State's exhibit No. 87.) In relevant part the text message contained a photograph that depicted Ransom with a handgun and an AR platform rifle "that is black and tan in color," and "loaded with a magazine." (Tr. 716; State's exhibit No. 87.) Ransom later sent the photograph to a second individual and stated, "[D]on't show nobody." (Tr. 1555.)

{¶ 32} Agent McCaskill testified that she participated in the execution of a search warrant at the East 40th Street apartment complex on March 25, 2022. During the search of the apartment, the investigators were attempting to locate a wooden table that was observable in Ransom's photograph of the rifle. Ultimately, the investigators confirmed that there was a similar wooden table in the apartment. The investigators also recovered a wallet containing Ransom's driver's license and social security card, an empty gun box, spent shell casings, a rifle magazine, and ammunition that was capable of being fired by the rifle depicted in Ransom's social media photograph. (Tr. 719, 895.) However, they were unable to locate the handgun or the rifle in the apartment.

{¶ 33} After his arrest, Ransom sent a letter to L.P. on July 3, 2022, stating:

> I really don't got much to say but I think the prosecutor's go [sic] call you to the stand and ask you some questions like have you seen this gun and who bullets was those. I think you should say your ex-boyfriend brother had the gun and bullets and was tryin to sell it before he went out of town or moved out of town. . . . But if you [sic] not comfortable doing that I understand. But that's what I'll say.

(State's exhibit No. 936.)

{¶ 34} Wilborn's identity only became known following an interview with Washington during the grand jury proceedings. (Tr. 1449.) Washington could not recall Wilborn's name and could only provide a vague physical description. (Tr. 1563.) Subsequently, the police discovered that Ransom and Fisher each had a contact in their cell phones named "Killz." Ransom and Fisher each sent text messages to "Killz" on the night of April 7, 2021, telling him about the gathering at the Union Avenue residence. This stood out to the investigators because the plan to rob Crawford materialized at the Union Avenue residence. After the police confirmed that the phone number associated with the contact "Killz" was registered to Wilborn, Lugo confirmed his involvement in the shootings by identifying him in a photo array. The investigators then learned that Wilborn was wearing a GPS ankle monitor during the duration of the incident, allowing the investigators to map his precise movements before, during, and after the shootings occurred. (Tr. 1566, State's exhibit No. 803.) The GPS data confirms that Wilborn went to the residences located on Union Avenue, Harvard Avenue, and East 40th Street. The data further confirms that Wilborn was present at the scene of the homicide at East 107th Street and Elk Avenue. (State's exhibit Nos. 803-805.)

{¶ 35} In the course of the investigation, the police used a software program to extract data from the cell phone discovered on H.R.'s person at the crime scene, and the cell phones recovered from Ransom, Fisher, Lugo, Washington, and Wilborn at the time of their arrests. The GPS and cellular data recovered from the cell phones was used in collaboration with surveillance-video footage to determine

the parties' movements and actions in the hours preceding the shootings. Ransom's cell phone showed activity at the Union Avenue and Harvard Avenue residences on the night of April 7, 2021, and early morning of April 8, 2021. (State's exhibit No. 801.) However, Ransom's cell phone was not in the proximity of East 107th Street and Elk Avenue at the time of the shootings on April 8, 2021. (Tr. 1155-1156.) Ransom's last reported activity prior to the shootings was a phone call placed at 4:22 a.m. near the East 40th Street apartment complex. (Tr. 1156.)

{¶ 36} At the close of the State's case-in-chief, defense counsel moved for an acquittal pursuant to Crim.R. 29. Following an extended discussion, the trial court granted the motion as it pertained to the tampering with evidence and obstructing justice offenses (Counts 30 and 34). (Tr. 1716.) The motion was denied as to the remaining offenses. (Tr. 1733.) Defense counsel then rested without presenting any witnesses.

{¶ 37} At the conclusion of trial, the jury found Ransom not guilty of aggravated murder and murder as charged in Counts 2, 6, and 10. However, Ransom was found guilty of murder (Count 14), felonious assault (Count 18), improper discharging of a firearm at or into habitation or school (Count 22), felonious assault (Count 26), and improperly handling a firearm in a motion vehicle (Count 29). Ransom was also found guilty of the repeat violent predator specifications attached to Counts 14, 18, 22, and 26 and the notice of prior conviction specifications attached to Counts 18, 22, and 26. However, he was found not guilty

of the firearm specifications attached to Counts 14, 18, 22, 26, and 29 and the criminal gang activity specifications attached to Counts 14, 18, 22, and 26.

{¶ 38} The trial court then found Ransom guilty of involuntary manslaughter, with firearm, repeat violent offender and notice of prior conviction specifications (Count 38), and having weapons while under disability, with firearm specifications (Count 41). Finally, Ransom was found not guilty of criminal gang activity as charged in Count 36.

{¶ 39} On August 31, 2023, Ransom was sentenced to an aggregate prison term of 27 years to life. (Tr. 2253.)

{¶ 40} Ransom now appeals.

## II. Law and Analysis

### A. Prosecutorial Misconduct

{¶ 41} In the first assignment of error, Ransom argues the State committed prosecutorial misconduct by improperly referring to facts that were not in evidence during its closing statement.

{¶ 42} A prosecutor has wide latitude in closing argument and is free to comment on what the evidence has shown and reasonable inferences that can be drawn from that evidence. *State v. Harris*, 2017-Ohio-2751, ¶ 84 (8th Dist.). However, a prosecutor must avoid any declarations, claims, or averments that are deliberately calculated to mislead a jury. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Similarly, an attorney's advocacy should not go beyond the evidence and the

reasonable inferences that may be drawn from the evidence. *Barnett v. Thornton*, 2002-Ohio-3332, ¶ 24 (10th Dist.).

{¶ 43} Allegations of prosecutorial misconduct in closing argument are reviewed to determine "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. McAlpin*, 2022-Ohio-1567, ¶ 156, quoting *Smith* at 14. A trial should only be reversed on the grounds of prosecutorial misconduct "if the effect of the misconduct 'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 2013-Ohio-4372, ¶ 99 (8th Dist.), quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, (12th Dist. 1995). "'The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor.'" S*tate v. Gapen*, 2004-Ohio-6548, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 44} In this case, the closing remarks disputed on appeal relate to defense counsel's introduction of a two-second video, marked Defense exhibit B. The video was introduced during the cross-examination of Lugo to impeach her testimony that she had never had a gun or rifle in her vehicle before the night of the shooting. (Tr. 1420-1421.) The video, which was extracted from Lugo's cell phone during the police investigation, shows an unidentified man holding a black rifle inside Lugo's vehicle. The video does not depict a readily observable time or date stamp. Nevertheless, Ransom argues that the video clearly contradicted Lugo's prior testimony and "cast[s] serious doubt on [her] contention that she was not the shooter," or more significantly involved in the shooting. (Appellant's brief, p. 21.)

{¶ 45} During closing arguments, the prosecutor asserted that defense counsel's introduction of Defense exhibit B was an attempt to "hoodwink" the jury into believing that Lugo possessed a video depicting the actual shooter of the black rifle. (Tr. 1848.) In challenging the relevancy of Defense exhibit B, the prosecutor noted, over defense counsel's objection, that the video's "metadata" demonstrated that it "was created in January of 2021 before the homicide." (Tr. 1849.) Specifically, the prosecutor encouraged the jury to "right click on the exhibit, select properties, and select details" to see that the video was created on January 5, 2021, at 11:03 p.m. — well before the date of the shooting. (Tr. 1848-1849.)

{¶ 46} On appeal, Ransom maintains that the exhibit's metadata was not referenced during the State's case-in-chief, and therefore, the State was not permitted to ask the jury "to examine facts – the creation date of the exhibit — not in evidence[.]" Ransom further asserts that the prosecutor's statements were prejudicial to his defense, stating:

> Mr. Ransom was on his way to convincing the jury that he did not participate in either shooting, either as the primary offender or as an accomplice. Exhibit B was the cornerstone of counsel's arguments that there was another shooter. Coupled with a shoddy investigation, there was reasonable doubt as to whether the police had zeroed in on the wrong suspects without truly examining all the possibilities. The State destroyed that doubt, not with evidence, but with an impermissible argument.

(Appellant's brief, p. 23.)

{¶ 47} After careful review of the record, we find Ransom has not demonstrated that he was denied a fair trial based on the prosecutor's limited

comments. The information reflecting the date and time the video captured in Defense exhibit B was created is incorporated into the metadata of the video and is, therefore, part of the exhibit. We find no basis to conclude that the prosecutor commented on facts not in evidence by highlighting information that is intrinsically part of an exhibit introduced by the defense. Accordingly, we find no misconduct.

{¶ 48} Moreover, a review of the trial transcript clearly fails to demonstrate that Ransom would have been found not guilty of Counts 14, 18, 22, 26, and 29 but for the claimed error of prosecutorial misconduct. It is clear beyond a reasonable doubt that the jury would have found Ransom guilty of these offenses regardless of the alleged misconduct of the prosecutor during closing arguments. Defense exhibit B was merely used to impeach Lugo's testimony that she had not previously seen a firearm in her vehicle prior to the shooting. Beyond an unsupported inference, no additional testimony or evidence was introduced to suggest the video was taken in the days leading up to the shooting or that the unidentified male in the video was connected to the shooting. As discussed further in the third assignment of error, the trier of fact was presented with all relevant information concerning the credibility of the State's witnesses, including the testimony of Lugo and Washington placing Ransom at the scene of the shooting and in possession of a large rifle. Thus, we find that Ransom was not prejudiced by the remarks at issue made by the prosecutor during closing arguments. *See State v. Hanna*, 2002-Ohio-2221; *State v. Stevens*, 2023-Ohio-4683 (6th Dist.); *State v. Erker*, 2019-Ohio-3185 (8th Dist.).

{¶ 49} The first assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 50} In the second assignment of error, Ransom argues the State failed to present sufficient evidence to support his murder conviction or the predicate offense of felonious assault. Ransom contends that the evidence failed to establish, beyond a reasonable doubt, that he was complicit in the commission of the offenses. Ransom does not challenge the sufficiency of the evidence supporting the remaining convictions. Accordingly, we limit our review to Counts 14 and 18.

{¶ 51} A sufficiency challenge requires a court to determine whether the State has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

{¶ 52} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.). Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

Further, circumstantial evidence is not only sufficient, "'"but may also be more certain, satisfying, and persuasive than direct evidence.'"" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 2011-Ohio-6078, ¶ 9 (8th Dist.), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

{¶ 53} As discussed, Ransom was convicted of murder in violation of R.C. 2903.02(B), which provides as follows:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

Pursuant to that provision, the "commission of another felony offense is a necessary predicate to an R.C. 2903.02(B) offense, and the predicate felony must be a proximate cause of the death R.C. 2903.02(B) prohibits." (Citation omitted.) *State v. Cook*, 2010-Ohio-6222, ¶ 49 (2d Dist.). To sustain a conviction for felony murder, the State must prove the elements of the predicate offense beyond a reasonable doubt. *See, e.g., State v. Taylor*, 2020-Ohio-3589, ¶ 27 (8th Dist.).

{¶ 54} In this case, the predicate felony offense at issue is felonious assault in violation of R.C. 2903.11(A)(1). The statute provides that "[n]o person shall knowingly . . . [c]ause serious physical harm to another or to another's unborn." Taken together, a person commits felony murder with a felonious-assault predicate when he or she knowingly causes serious physical harm to another and that conduct is the proximate cause of another's death. *State v. Owens*, 2020-Ohio-4616, ¶ 9.

{¶ 55} On appeal, Ransom does not dispute that H.R. suffered serious physical harm that was the proximate cause of her death. Ransom argues, however, that the State did not present sufficient evidence to establish that he aided and abetted Fisher in the commission of the predicate offense. He contends that, at the very most, the State merely proved his presence at the scene of the shooting.

{¶ 56} Under Ohio's complicity statute, "No person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). A defendant guilty of complicity "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated . . . in terms of the principal offense." R.C. 2923.03(F).

{¶ 57} To "aid or abet" is to "'assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. McFarland*, 2020-Ohio-3343, ¶ 26, quoting *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001). As the Ohio Supreme Court has explained:

> "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson* at syllabus. "'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id*. at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971).

*McFarland* at ¶ 29. However, "[t]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). "Mere association with

the principal offender . . . is [also] insufficient to establish complicity." *State v. Hoston*, 2015-Ohio-5422, ¶ 13 (8th Dist.), citing *State v. Doumbas*, 2015-Ohio-3026 (8th Dist.).

{¶ 58} Viewing the evidence in a light most favorable to the State, we find Ransom's convictions were supported by sufficient evidence. In this case, the record reflects that Fisher and H.R. concocted a plan to rob her former boyfriend on April 7, 2021. During a house party held at the Union Avenue residence, Fisher discussed the plan in further detail with Ransom and Wilborn, causing Ransom to return to his apartment to retrieve a large black duffle bag. Sometime after 4:00 a.m. on April 8, 2021, the parties travelled in two vehicles to the location of the Crawford residence. When H.R. was unable to immediately identify Crawford's residence, Fisher began to suspect that she had set them up. He expressed his concerns to Ransom and stated that he had to kill her. According to Washington, who was present during this conversation, Ransom supported Fisher's decision and agreed that H.R. had to be killed. After Fisher followed through with his plan and shot H.R. two times, Ransom brandished a large firearm inside Washington's vehicle and fired multiple rounds into the Crawford residence as Washington drove by. Ransom then dropped the firearm off at the Union Avenue residence and immediately met back up with Fisher at his Harvard Avenue residence. At approximately 7:31 a.m. that morning, Ransom sent a text message to L.P., notifying her that things did not go as planned. Later that day, the parties travelled to South Carolina together, where they remained for several days.

{¶ 59} Contrary to Ransom's position on appeal, the evidence did not demonstrate that, at the very most, he was merely present at the time Fisher decided to shoot and kill H.R. Rather, Ransom's conduct before and after the shooting established that he "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime" and shared the criminal intent of the principal. Here, Ransom took active steps to retrieve a firearm to facilitate the planned robbery and later supported Fisher's decision to kill H.R. when the robbery failed to materialize. He then hid the gun used in the drive-by shooting and fled the State with the principal shooter for several days. Lastly, the evidence demonstrated that Ransom attempted to conceal his role in the shootings by (1) telling Washington to keep quiet, (2) asking L.P. to lie about the ammunition discovered in their apartment, and (3) contacting a gunsmith to modify the firing characteristics of a rifle. Collectively, this evidence would permit a reasonable juror to conclude, beyond a reasonable doubt, that Ransom was complicit in the commission of murder and the predicate offense of felonious assault.

{¶ 60} The second assignment of error is overruled.

### C. Manifest Weight of the Evidence

{¶ 61} In the third assignment of evidence, Ransom argues his convictions are against the manifest weight of the evidence.

{¶ 62} While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion. *See State v.*

*Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d at 387; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶ 63} On appeal, Ransom argues his convictions are against the manifest weight of the evidence because "no reasonable juror would have found Veronica Washington and Esperanza Lugo credible." Ransom states that "this case rests on the words of two known liars who both had reason to dislike H.R."

{¶ 64} Physical evidence is not required to sustain a conviction against a manifest weight challenge. *See, e.g., State v. Robertson*, 2018-Ohio-2934, ¶ 32 (8th Dist.). In fact, a conviction may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a victim's testimony be corroborated to be believed. *See, e.g., State v. Black*, 2019-Ohio-4977,

¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, ¶ 84 (4th Dist.); *State v. Dudley*, 2017-Ohio-7044, ¶ 10 (9th Dist.); *see also State v. Robinson*, 2014-Ohio-1624, ¶ 12 (8th Dist.) ("'Even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable [factfinder] could find the eyewitness testimony to be credible.'"), quoting *State v. Johnson*, 2014-Ohio-494, ¶ 52 (8th Dist.).

{¶ 65} With respect to Lugo's and Washington's credibility, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Kyle*, 2020-Ohio-3281, ¶ 29 (8th Dist.); *State v. Bradley*, 2012-Ohio-2765, ¶ 14 (8th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Lawson*, 1997 Ohio App. LEXIS 3709, *4 (2d Dist. Aug. 22, 1997). "The jury may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.'" *State v. Burks*, 2018-Ohio-4777, ¶ 48 (8th Dist.), quoting *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 66} Similarly, a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are inconsistent or contradictory. *State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.) ("'A conviction is

not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 2005-Ohio-4547, ¶ 11 (10th Dist.); *State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.) ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, . . . such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245, *7 (10th Dist. May 28, 1996).

{¶ 67} Upon reviewing the evidence presented at trial, we are unable to conclude that Ransom's convictions are against the manifest weight of the evidence. In this case, Lugo and Washington provided extensive insight into the parties' movements before, during, and after the shootings. Lugo discussed the formulation of the plan to complete a robbery at the Crawford residence, and Washington provided sufficient details concerning (1) the conversation between Fisher and Ransom inside her vehicle when they arrived at the scene, (2) Ransom's verbal acknowledgment that H.R. had to be killed, (3) Ransom's discharge of a rifle into the Crawford residence, and (4) Ransom's discarding of the rifle at the Union Avenue address. With the exception of Wilborn's location during the drive-by shooting, Lugo and Washington provided similar descriptions of each shooting and their testimony was mostly consistent their final statements to the investigators. Relatedly, the State introduced corroborating circumstantial evidence of Ransom's involvement in the shootings, including (1) phone tower records placing Ransom with the codefendants before and after the shooting, (2) a photograph sent by

Ransom of the type of rifle used during the drive-by shooting, (3) the discovery of ammunition in Ransom's apartment, (4) a text message sent by Ransom approximately two hours after the shooting indicating that the planned robbery "didn't go the way [they] wanted it to," (5) Ransom's attempt to change the firing pin on a NATO 556 rifle prior to his arrest, and (6) a letter sent by Ransom asking L.P. to lie about the ammunition and gun discovered in their apartment.

{¶ 68} We note that the credibility of Lugo and Washington was widely explored on cross-examination and the jury was provided all relevant information to assess the veracity of their testimony. Lugo and Washington openly admitted that the lied to the police at the beginning of the investigation and did not provide truthful insight into the shootings until plea negotiations were initiated. They also confirmed that they pleaded guilty to reduced charges and were required to testify against Ransom as a condition of their plea deals. Defense counsel also highlighted various inconsistencies between their testimonies and their potential motives for deflecting blame towards Fisher and Ransom. As evidenced by the findings of not guilty on several charged offenses, it is clear the jury and the judge carefully considered the evidence and the credibility of each witness when rendering its verdict.

{¶ 69} Under the foregoing circumstances, we cannot say that "the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *State v. Bell*, 2019-Ohio-340, ¶ 41 (8th Dist.). The trier of fact was provided with all relevant information to assess

Ransom's involvement in the shootings and his convictions are not against the manifest weight of the evidence merely because the trier of fact believed the State's witnesses. *See, e.g., State v. Brightwell*, 2019-Ohio-1009, ¶ 39, 42-44, 50 (10th Dist.) (jury was not required to disbelieve witness's testimony against defendant because testimony was procured pursuant to a plea agreement that permitted witness to plead guilty to a lesser charge and avoided a lengthy prison term); *State v. Fields*, 2021-Ohio-1880, ¶ 27-29 (8th Dist.) (defendant's convictions were not against the manifest weight of the evidence; where jury was aware of accomplice's role in the robbery and her plea deal, it could weigh witness' credibility and determine whether or not they believed her testimony about defendant's role in the robbery).

{¶ 70} The third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶ 71} In the fourth assignment of error, Ransom argues defense counsel rendered ineffective assistance of counsel by failing to object to the State's presentation of cumulative, gruesome, and minimally probative photographs of H.R.'s body and mortal wounds. Ransom contends that "the extra prejudice generated by these photos prevented a fair trial."

{¶ 72} Ohio Const., art. I, § 10 and the U.S. Const., amend. VI provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel

is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

{¶ 73} To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that her trial counsel's representation was deficient, and that the deficient performance was prejudicial. *State v. Jones*, 2016-Ohio-688, ¶ 14 (8th Dist.), citing *Strickland* at 687-688. To establish that counsel was deficient, Ransom must demonstrate that defense counsel's performance fell below an objective standard of reasonableness. *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). To establish that counsel's deficient performance was prejudicial, Ransom must demonstrate that there exists a reasonable probability that, were it not for counsel's errors, the results of the proceeding would have been different. *State v. White*, 82 Ohio St.3d 16, 23 (1998).

{¶ 74} A reviewing court must give great deference to counsel's performance in reviewing an ineffective-assistance-of-counsel claim. *Strickland* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.), citing *Bradley* at 141. Counsel's decisions relating to strategy are granted wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze trial counsel's legal tactics and maneuvers. *State v. Edgerson*, 2015-Ohio-593, ¶ 6 (8th Dist.). If tactical or strategic trial decisions are unsuccessful, that does not generally constitute

ineffective assistance of counsel. *Id.*, citing *State v. Cossack*, 2009-Ohio-3327, ¶ 36 (7th Dist.).

{¶ 75} Generally, the State "is free to choose amongst available options as to how to present evidence in support of its case." *State v. Williams*, 2000 Ohio App. LEXIS 1233, *32 (7th Dist. Mar. 20, 2000). Recognizing this, Ohio courts have found that photographs may be used for a wide variety of purposes, including corroborating witness testimony, establishing the intent of the accused, and showing the nature and circumstances of the crime. *State v. Jalowiec*, 91 Ohio St. 3d 220, 230 (2001).

{¶ 76} In this case, the State presented approximately 26 crime scene and approximately 11 autopsy photographs during the direct examination of Dr. Felo. (State's exhibit Nos. 601, 605, 608, 610, 612-613, 615, 620-621, 631-632, and 637-662.) The photographs depict H.R.'s body at the scene of the shooting and various angles of the injuries discovered during the autopsy, including the gunshot wounds to her head, chest, and arm. Dr. Felo further described his discovery of a bullet fragment in H.R.'s skull and stated that she lost "a third to 40 percent of her total blood circulation." (Tr. 554-557.) In addition, the State introduced photographs taken by the crime scene unit at the location where H.R.'s body was discovered. (Tr. 676-677, State's exhibit Nos. 1-33.) The photographs also depict various angles of H.R.'s body and injuries at the scene of the shooting.

{¶ 77} On appeal, Ransom argues that Dr. Felo's "graphic" description of H.R.'s injuries and the gruesome photographs of her body at the crime scene and

during the coroner's examination were excessive and unduly prejudicial because (1) the manner of death was not disputed, and (2) the State did not allege that Ransom fired the gun that killed H.R. Thus, Ransom contends that defense counsel's failure to raise a timely objection to the photographs encouraged the jury to "feel intense hatred towards [him]" and "prevented a fair trial."

{¶ 78} It is well settled that "the prosecution is entitled to present evidence showing the cause of death, even if the cause is uncontested, to give the jury an 'appreciation of the nature and circumstances of the crimes.'" *State v. Catron*, 2015-Ohio-2697, ¶ 25 (8th Dist.), quoting *State v. Chatmon*, 2013-Ohio-5245, ¶ 41 (8th Dist.). Moreover, the State has latitude in constructing its case and determining the manner by which it meets its burden of proof. *See State v. Mammone*, 2014-Ohio-1942, ¶ 99, 103 ("[T]he [S]tate bears the burden of proof and it has no obligation to meet that burden in the least gruesome way.").

{¶ 79} The admissibility of gruesome photographs in a noncapital case is considered with reference to Evid.R. 403. *Mammone* at ¶ 95-96, quoting *State v. Morales*, 32 Ohio St.3d 252, 257-258 (1987); R.C. 2901.02(B). Under Evid.R. 403(A), otherwise relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The exclusion of relevant evidence under Evid.R. 403(A) rests within the discretion of the trial court. *State v. Skatzes*, 2004-Ohio-6391, ¶ 107, citing *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus.

{¶ 80} Relatedly, it is well recognized that "autopsy photographs are generally admissible to help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake.'" *State v. Costell*, 2016-Ohio-3386, ¶ 142 (3d Dist.), citing *State v. Gross*, 2002-Ohio-5524, ¶ 52. Consequently, autopsy photographs — even if gruesome — are not per se inadmissible. *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

{¶ 81} After careful consideration, we are unable to conclude that defense counsel rendered ineffective assistance of counsel by failing to object to the State's introduction of crime scene and autopsy photographs. Although several of the admitted photographs could be characterized as gruesome, the State was permitted to introduce relevant evidence concerning the cause and nature of H.R.'s fatal injuries. In this case, the information gleaned from the crime scene photographs, including how H.R.'s body was discovered, the position of the cell phone and charging cord found on H.R.'s person, the lack of gunpowder on H.R.'s body, and the defensive wounds observed on H.R.'s arm, assisted the trier of fact in understanding the time, location, and manner of H.R.'s death. *See State v. Woodards*, 6 Ohio St.2d 14, 25 (1966) (Even a photograph that can be characterized as gruesome is admissible if the trial court, in exercising its discretion, feels that it would be useful to assist the jury.). Collectively, this evidence corroborated the testimony of State witnesses and allowed the trier of fact to assess the identity of the shooter and the motive of the crime.

{¶ 82} Similarly, the autopsy photographs illustrated the coroner's testimony and provided the trier of fact with a "total appreciation of the nature and circumstances of the crimes." *State v. Diar*, 2008-Ohio-6266, ¶ 103, 109, citing *State v. Evans*, 63 Ohio St.3d 231, 251 (1992). In addition, Dr. Felo's discussion of the bullet removed from H.R.'s skull was not only proper but necessary in explaining H.R.'s injuries and cause of death. The testimony also provided context to the subsequent ballistic analysis and the State's ability to confirm that the bullets removed from H.R.'s body were fired from the same gun.

{¶ 83} Because the danger of unfair prejudice to Ransom did not substantially outweigh the probative value of the crime scene and autopsy photographs, we find defense counsel's performance did not fall below an objective standard of reasonableness. Moreover, to the extent the introduction of some photographs can be construed as being cumulative, Ransom has not demonstrated the existence of prejudice. As discussed, most of the disputed photographs were "of probative value to assist the trier of fact in determining the issues, 'or are illustrative of testimony and other evidence.'" *State v. Motley*, 2023-Ohio-1811, ¶ 43 (8th Dist.), quoting *State v. Franklin*, 62 Ohio St.3d 118, 125 (1991). While the admission of cumulative or repetitive photographs is improper, Ransom has not established that, but for the admission of any duplicative photographs, the results of the proceeding would have been different. As previously discussed, the State presented competent and credible evidence of Ransom's role in the planned robbery of Crawford's

residence, his active participation in the drive-by shooting into Crawford's habitation, and his efforts to aid and abet Fisher in the shooting death of H.R.

{¶ 84} The fourth assignment of error is overruled.

{¶ 85} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR