[Cite as *State v. Fulton*, 2011-Ohio-4259.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 96156

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ROMEO FULTON

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-537192

**BEFORE:** Boyle, P.J., S. Gallagher, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 25, 2011

**ATTORNEY FOR APPELLANT**

Michael V. Heffernan
75 Public Square
Suite 700
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
BY:   Marc D. Bullard
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY J. BOYLE, P.J.:

{¶ 1}   Defendant-appellant, Romeo Fulton, appeals his convictions and sentence.   He raises four assignments of error for our review:

{¶ 2}   "[1.] Mr. Fulton's conviction was against the manifest weight of the evidence.

{¶ 3}   "[2.] Mr. Fulton's conviction is against the sufficiency of the evidence.

{¶ 4}   "[3.] The trial court erred in instructing the jury regarding Mr. Fulton's possession of a firearm or deadly weapon.

**{¶ 5}** "[4.] The trial court committed reversible error in sentencing Mr. Fulton to a mandatory three years of incarceration on the underlying firearm specifications."

**{¶ 6}** Finding no merit to his appeal, we affirm.

<u>Procedural History and Factual Background</u>

**{¶ 7}** The grand jury indicted Fulton on six counts: two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1), with one- and three-year firearm specifications; two counts of robbery, in violation of R.C. 2911.02(A)(3); and two counts of kidnapping, in violation of R.C. 2905.01(A)(2), with one- and three-year firearm specifications. The following facts were presented to a jury.

**{¶ 8}** Earl Buck and Dolores Gill testified that on August 22, 2009, they were working at Bob Adam's Sunoco ("Sunoco") in Bedford, Ohio. They closed the store at 10:00 p.m. The door had been locked since 8:00 p.m., however, because business was conducted through a window after that time. Fulton, who lived across the street from the Sunoco, was a regular customer at the store. Buck and Gill remembered that Fulton came to the window after they had closed the store and asked them if they would give him a cigarette. They told him no and he left. They then saw him walk toward the Colony Club 2 condos.

**{¶ 9}** After closing, Buck and Gill walked out the front of the store and Buck set the alarm. As Gill was walking to her car, she noticed that a light-skinned black male was walking toward her; he had a gray scarf covering his mouth. The man came from the

location of the Colony Club 2 condos. The man was wearing white gloves and a green "hoodie." Gill recognized the man as one of the store's regular customers, whose name she thought was "Carlton Banks." The man grabbed Gill by the arm and "shoved what [she] believed to be a gun in [her] back" and told Buck "if you don't get out of your truck right now, I'm going to shoot her." Gill testified that she believed the object to be a gun because it was hard and blunt and "was pressed into [her] back to where [she] felt [her] back actually burning." Buck explained that he never actually saw a gun, but saw that the man's "sleeve was pulled over his hand, and it looked like the tip of a gun."

{¶ 10} Buck got out of his truck and opened the door to the gas station. The man forced them to get onto the floor with their faces down. The man kept demanding the keys to the safe. They kept telling the man that they did not have the keys. Approximately one minute later, the automatic alarm went off because Buck had opened the front door without entering the security code and the man ran out of the gas station. The man ran toward the Colony Club 2 condos. The whole incident lasted approximately two minutes.

{¶ 11} Buck explained that he used to date Kelly Justice. It lasted about one and a half to two months. He said that he ended the relationship just days before the robbery. He stated that Justice was "highly upset."

{¶ 12} Justice testified that she pleaded guilty to a lesser charge of robbery in exchange for testifying against her codefendants, including Fulton. Justice explained that she used to

work at the Sunoco up until just before the robbery took place. She stated that she was fighting with Buck on the night of the robbery.

{¶ 13} Justice admitted that she took part in the robbery. She provided Fulton with information about the store, including what she believed to be the best time to rob it, which was 8:00 p.m., right before they locked the doors. She also told Fulton "how much money was in there." Justice stated that it was Fulton's idea to rob the store and he told her that he would "set everything up."

{¶ 14} On the night of the robbery, Justice testified that she was watching the store with her two daughters waiting for Buck to get off work. She saw Fulton and asked him what he was doing. He told her "it was about ready to go down." She asked him if he meant the robbery and he replied, "yes." She left and went to her mom's. But she said that Fulton called her and told her about the robbery while it was happening and that he was laughing about it.

{¶ 15} Justice agreed to wear a wire to get Fulton to talk about the robbery. The recording was played for the jury and reflected that when Fulton got into Justice's car, she told him she wanted to talk to him about something. He asked her, "what?" She said that she wanted to talk to him about getting something done in Columbus. He said, "what do you want done?" She said "like that lick at the Sunoco." Fulton replied, "is there one of them down there?" Justice said, "oh hell yea there is." Fulton's voice got louder at that point

and he asked Justice, "why do you got to talk about business?" At that point, Fulton acted like he never heard of the Sunoco robbery. Fulton stated, "don't bring that up *** you should have just said 'I need something done.'" A couple of minutes later, Fulton asks Justice, "when do you want me to take care of that?" Justice replied, "can you get a couple of people like before?" Fulton responded, "yea." Justice said, "not the same fucking ones." Fulton replied, "*** I know." Soon after that, Fulton says, "it was sloppy, I know." Justice then asks Fulton "are you going to be able to get a gun and stuff like you did before?" The state asserts that Fulton replied "yeah," but upon our independent review of it, Fulton's response is muffled on the recording and this court cannot decipher what his reply was.

{¶ 16} Justice's daughters, Charlee Seiber and Shayla Maynard, testified as to what occurred on the night of the robbery. They corroborated Justice's testimony for the most part. They stated that Fulton was with "Moe," whose real name was Maurice Baker. There was another person with Fulton, who they thought was "Carlton," but they were not sure, and Maynard thought there might have been a fourth person with them, but she did not know who he was. Fulton told them that they were about to rob the Sunoco. Maynard and a friend went to "watch" the robbery take place. Maynard testified that she actually overheard her mother and Fulton talking about the robbery earlier in the day before the robbery occurred. Maynard also testified that her mother was supposed to receive money from the robbery.

{¶ 17} Jamie Kubinski testified that she met Fulton at her friend's, Shawn Sigan's, house a couple of days before the robbery. Fulton was with Maurice Baker, also known as "Moe." Kubinski did not know Fulton but Fulton told her that he was going to "hit a lick" (which she explained meant stealing from someone), and asked her if she knew where he could get a gun. Kubinski told him no. Sigan also testified and corroborated Kubinski's testimony.

{¶ 18} Carlton Bankston testified that he was taken into custody in connection with the Sunoco robbery, but he was eventually released. He stated that he was at the Sunoco around 8:30 p.m. with his friends "Bryant" and "Terrence" when Fulton came up to their car window and told them that something was "about to go down" and they need to get out of there, so they left.

{¶ 19} Detective Buck Kidd testified that Gill chose Carlton Bankston in a photo array as the person who robbed the store. Detective Kidd obtained a search warrant for Bankston's home and searched it but did not find anything. After talking to Bankston, Detective Kidd confirmed Bankston's alibi, and released him from custody. Detective Kidd learned through his investigation that Maurice Baker and Dion Kelly were also involved in the robbery, and that Kelly was the actual gunman.

{¶ 20} Detective Kidd arrested Kelly. Detective Kidd took Kelly to the scene of the robbery to locate an "object" that Kelly said he used in the robbery and had thrown when he

ran from the store, but he could not locate it. On cross-examination, Detective Kidd admitted that Kelly denied having a gun. Kelly told Detective Kidd that he used a hammer, not a gun.

{¶ 21} Kelly testified for Fulton. He admitted to robbing the Sunoco station, claiming that he did it by himself because Justice told him about the store and suggested that he rob it. He testified that Fulton had nothing to do with the robbery. He stated that he did not have a gun or any weapon, not even a hammer. He testified that he used his hand in the robbery.

{¶ 22} Kelly agreed on cross-examination that he implicated Fulton in the robbery to police and that he told police that he had never had a conversation with Justice. He agreed that he told police that Fulton approached him "about eight times" regarding the Sunoco robbery but said that he lied to police when he told them that Fulton was involved. Kelly also agreed that he told police that Fulton had told him that they could get a couple thousand dollars from the Sunoco safe.

{¶ 23} The jury found Fulton guilty of both aggravated robbery counts with the three-year firearm specifications, but found him not guilty of the one-year firearm specifications; guilty of both counts of robbery; and guilty of two counts of a lesser included offense of kidnapping under R.C. 2905.01(A)(2), with the three-year firearm specifications, but not guilty of the one-year firearm specifications, and further found that both victims were released in a safe place unharmed.

{¶ 24} The trial court sentenced Fulton to an aggregate term of six years in prison: three years for the firearm specifications, to be served prior to and consecutive to the three years he received for the base crimes (three years on Count 1, three years on Count 2, two years on Count 3, two years on Count 4, two years on Count 5, and two years on Count 6, all to be served concurrent to one another). The trial court also advised Fulton that he would be subject to a mandatory period of five years of postrelease control upon his release from prison.

Sufficiency and Manifest Weight of the Evidence

{¶ 25} In his first and second assignments of error, Fulton argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Fulton raises the same arguments for both and thus, this court will address them together. Further, in these arguments, he only challenges the evidence dealing with the firearm specifications.

{¶ 26} When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶77, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶ 27}** In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotes and citations omitted.) *Leonard* at ¶81.

**{¶ 28}** Fulton argues that the state cannot rely on circumstantial evidence to prove that a firearm was used in the robbery because "the state knew full well no firearm was used in these offenses, in light of Dion Kelly's prior plea." As part of Kelly's plea deal, the state deleted the firearm specifications. Fulton argues that because of this, the state admitted that a firearm was not used. We disagree the state admitted anything by deleting the firearm specifications in the codefendant's plea negotitions. The state could have deleted the specifications for any number of reasons of which this court will not speculate. Further, Kelly's plea deal and resulting convictions are irrelevant to Fulton's guilt or innocence.

**{¶ 29}** R.C. 2941.145 requires proof beyond a reasonable doubt that "the offender had a firearm on or about the offender's person or under the offender's control while committing

the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 30} A "firearm" is: "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable. When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representation and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(1) and (2).

{¶ 31} In *Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph one of the syllabus, the Ohio Supreme Court elaborated on the requisite proof to sustain a firearm specification:

{¶ 32} "A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm." (Internal citations omitted.)

{¶ 33} With respect to operability, the Ninth Appellate District has explained:

{¶ 34} "This Court 'evaluate[s] the evidence of a firearm's operability by examining the totality of the circumstances.' *State v. McElrath* (1996), 114 Ohio App.3d 516, 519, 683 N.E.2d 430, citing *State v. Murphy* (1990), 49 Ohio St.3d 206, 208, 551 N.E.2d 932. In *McElrath*, this Court found that in cases where no shots are fired and the firearm is not recovered, circumstantial evidence, such as the representations and actions of the gun operator, are of crucial importance. Id. Specifically, this Court found that "'the implicit threat of brandishing a firearm" supports an inference that the firearm was operable.' *State v. Williams* (Dec. 27, 2000), 9th Dist. No. 19559, citing *McElrath* at 519-520." *State v. Ware*, 9th Dist. No. 22919, 2006-Ohio-2693, ¶13.

{¶ 35} In *State v. Robinson*, 8th Dist. No. 80718, 2003-Ohio-156, the defendant argued that the state failed to prove he used a firearm. This court disagreed, reasoning: "the person holding the rifle pushed it into the victim's back when he did not respond to the other gunman's orders. Clearly the jury could construe the shove of the barrel of the rifle into the victim's back as a threat that he would be shot by that rifle if he did not comply. This action and the logical inference which could be deduced from it provide sufficient evidence, if believed, to support the conclusion that the rifle fit the statutory definition of a qualifying firearm." Id. at ¶14.

{¶ 36} Here, Gill testified that Dion put what she believed to be a gun to her back; it was hard, blunt, and burned her back when he pressed it into her. Gill and Buck testified that

Dion said to Buck, "if you don't get out of your truck right now, I'm going to shoot her." Buck also testified that although he never actually saw the gun, he saw what looked like the tip of a gun in Dion's hand, under his sleeve.

{¶ 37} Although Dion testified that he did not use any weapon to commit the robbery, the jury apparently believed Gill and Buck over Dion. It is well settled that matters as to the credibility of evidence are for the jury to decide. *State v. Walker* (1978), 55 Ohio St.2d 208, 212, 378 N.E.2d 1049, certiorari denied (1979), 441 U.S. 924, 99 S.Ct. 2033, 60 L.Ed.2d 397.

{¶ 38} Reviewing the evidence in a light most favorable to the state, this court concludes that any rational trier of fact could have found that Dion indicated to Gill and Buck that he possessed a firearm and that the operability of the firearm was proved beyond a reasonable doubt. See *Jenks* at paragraph two of the syllabus. We further conclude that case is not the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387.

{¶ 39} Fulton's first and second assignments of error are overruled.

<u>Jury Instructions</u>

{¶ 40} In his third assignment of error, Fulton argues that the trial court erred in instructing the jury on possession of a firearm or deadly weapon because he was not the principal offender. We disagree.

{¶ 41} Fulton failed to object to the trial court's jury instructions and thus, we review for plain error. Crim.R. 52(B) provides that: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The appellate court, however, must find that the alleged error denied the defendant a fair trial. *State v. Wade* (1978), 53 Ohio St.2d 182, 373 N.E.2d 1244, paragraph one of the syllabus, certiorari granted and judgment vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157.

{¶ 42} Here, the trial court instructed the jury on possession of a deadly weapon. Fulton contends that he could not have "possessed" the weapon because Dion was the principal offender. An accomplice to a crime, however, is subject to the same prosecution and punishment, including sentencing enhancements, as the principal offender. See *State v. Chapman* (1986), 21 Ohio St.3d 41, 487 N.E.2d 566, syllabus; *State v. Moore* (1985), 16 Ohio St.3d 30, 33, 476 N.E.2d 355 (holding that unarmed accomplice to aggravated robbery is subject to a mandatory three-year term of actual incarceration on a firearm specification). The trial court here also instructed the jury on complicity.

{¶ 43} Accordingly, we find no error on the part of the trial court. Fulton's third assignment of error is overruled.

<u>Sentencing</u>

**{¶ 44}** In his fourth assignment of error, Fulton argues that the trial court erred in sentencing him on the firearm specification because it did not prove that the firearm was operable. We already determined that the state proved beyond a reasonable doubt that the firearm was operable. Accordingly, Fulton's fourth assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
EILEEN A. GALLAGHER, J., CONCUR