[Cite as *State v. Wilborn*, 2024-Ohio-5003.]

COURT OF APPEALS OF OHIO
EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,           :

                           No. 113289

    v.                             :

JIMMY WILBORN,                          :

    Defendant-Appellant.         :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 17, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672376-E

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Eben McNair, Assistant Prosecuting
Attorney, *for appellee*.

Robert A. Dixon, *for appellant*.

KATHLEEN ANN KEOUGH, A.J.:

{¶ 1} Defendant-appellant, Jimmy Wilborn, appeals from the trial court's

judgment entry of conviction rendered after a bench trial. He contends that his

convictions for involuntary manslaughter, having weapons while under disability,

and use of a firearm by a violent career criminal are not supported by sufficient

evidence or, alternatively, are against the manifest weight of the evidence. Finding no merit to the appeal, we affirm Wilborn's convictions.

## I.  Procedural History

{¶ 2}  In June 2022, the State named Wilborn in a 43-count indictment along with codefendants Dacee Fisher, Dion Ransom, Esperanza Lugo, and Veronica Washington.  The charges stemmed from events that occurred on April 8, 2021, including the shooting death of a female victim and a drive-by shooting of a residence on the Eastside of Cleveland.

{¶ 3}  Specific to Wilborn, the State charged him with aggravated murder (Counts 3 and 7), murder (Counts 11 and 15), felonious assault (Counts 19 and 27), improperly discharging a firearm into a habitation (Count 23), improperly handling firearms in a motor vehicle (Count 29), tampering with evidence (Count 30), obstructing justice (Count 35), participating in a criminal gang (Count 36), involuntary manslaughter (Count 39), having weapons while under disability (Count 42), and use of a firearm or dangerous ordnance by a violent career criminal (Count 43).  Various specifications were included in the indictment, including firearm, criminal gang activity, repeat violent offender, and notices of prior conviction.

{¶ 4}  Lugo and Washington accepted plea agreements with the State and agreed to testify at the joint trial against Wilborn, Fisher and Ransom.  Both

Wilborn and Fisher waived their right to a jury, electing for a bench trial. Ransom elected to have some of his charges tried to a jury and others to the bench.[1]

## II. Bench Trial

### A. A Robbery Plan Goes Awry

{¶ 5} On April 6, 2021, Fisher and Lugo befriended the 17-year-old female victim at Edgewater Park in Cleveland. Fisher invited the victim to his apartment, located on Harvard Avenue in Cleveland, where they all spent the evening together. Subsequent DNA forensic testing revealed that Fisher and the victim engaged in sexual relations. The following day, the group met up with Ransom and Washington at a house party on Union Avenue. During the course of the evening, Fisher and the victim designed a plan to rob the victim's "boyfriend or ex-boyfriend," Duane Crawford. They devised the plan after the victim disclosed to Fisher that Crawford's residence, which was located on East 108th Street, contained guns, cash, and credit cards.

{¶ 6} As the plan developed, Fisher contacted Wilborn, who was living in the Akron area, and asked him to come up to the Union Avenue address. According to Lugo, the idea to rob Crawford "started off as [the victim's] plan that she brought to [Fisher] and then it moved on from [Fisher] to [Wilborn] and [Ransom]." (Tr. 1321.) Fortunately for police, Wilborn wore a GPS monitoring device on his ankle

---

[1] Ransom and Fisher appealed their convictions, which this court affirmed in *State v. Ransom*, 2024-Ohio-2634 (8th Dist.), and *State v. Fisher*, 2024-Ohio-4484 (8th Dist.). A full and complete recitation of the facts can be found in those decisions.

that tracked his whereabouts on April 7-8, 2021. Accordingly, once the police discovered Wilborn's involvement, the movement of the group was easily ascertainable.

{¶ 7} Lugo testified that she, Fisher, Wilborn, and the victim left the Union Avenue residence after midnight on April 8, 2021, and drove Fisher's Toyota SUV to Fisher's residence on Harvard Avenue to "wait for the time that whoever we were supposed to rob was going to be home." (Tr. 1325.) To determine Crawford's whereabouts, the victim sent Crawford a text message at 11:19 p.m. on April 7, 2021. As the evening progressed, the victim continued to send Crawford text messages, stating that she wanted to "talk to [him] about something" in person. (Tr. 480-483.) Crawford testified, corroborating that the victim communicated with him that evening.

{¶ 8} Ransom and Washington also left the Union Avenue residence after midnight. Washington, who drove a red Ford Fusion, took Ransom to an apartment complex located on East 40th Street, where he lived with L.P., the mother of his child. Ransom went inside the apartment building, and Washington fell asleep inside her vehicle. At approximately 1:22 a.m., Ransom sent a Facebook message to an unidentified woman, stating, "I left my phone at [Fisher's] house. I told you what we was on[.] Love you. Talk to you later." (Tr. 1567, State's exhibit No. 937.) Ransom returned to Washington's vehicle with a large black duffel bag.

{¶ 9} At approximately 4:35 a.m. on April 8, 2021, Fisher, Lugo, Wilborn, and the victim met Ransom and Washington at the East 40th apartment complex.

Shortly thereafter, the parties left and drove toward Crawford's residence. Lugo drove the Toyota SUV, with the victim seated in the front passenger seat, and both Fisher and Wilborn sat in the back seat. Washington drove the red Ford Fusion with Ransom sitting in the front passenger's seat. City surveillance, home security cameras, and the victim's cell phone recorded the movements of each vehicle during the trip to the Crawford residence. Additionally, Wilborn's GPS monitor tracked his location, which coincided with the other recording methods.

{¶ 10} A home security system on Elk Avenue near Martin Luther King, Jr. Park recorded the two vehicles arriving near the Crawford residence at approximately 5:07 a.m. According to Lugo, they drove their vehicles "up and down random streets" until the victim was able to positively identify Crawford's residence. (Tr. 1330.) The group then drove around the corner from Crawford's residence and parked at the intersection of East 107th Street and Elk Avenue at approximately 5:12 a.m. They remained near their parked vehicles while they contemplated "what they were going to do." (Tr. 925.)

{¶ 11} Although both Washington and Lugo testified that Wilborn exited the SUV and walked back to Washington's car to have a discussion with Ransom, the women's testimonies conflicted about whether Wilborn remained in Washington's Ford Fusion or returned to the SUV and whether he was present during Ransom and Fisher's subsequent conversation.

{¶ 12} According to Washington, Wilborn exited Lugo's vehicle, approached her vehicle, and had a discussion with Ransom. Washington stated

that she did not hear the exact content of the discussion, but that "[t]hey were trying to figure out like what was going on, what they were going to do." (Tr. 945.) Washington first stated that Wilborn went back to Lugo's car (tr. 945, 1026) but then stated she was unsure whether he did.

{¶ 13} Washington stated that Fisher then exited Lugo's car, walked to her car, and had a discussion with Ransom. According to Washington, Fisher had a revolver in his possession. She stated that Fisher believed that the victim "was setting them up" and that "he was going to kill her." (Tr. 928.) Washington said that she pleaded with Fisher to not kill "that girl." (*Id*.) Ransom, however, agreed with Fisher's assessment and stated that the victim had to be killed. (*Id*.) Fisher then returned to the Toyota SUV and walked the victim into the park where he shot her twice. Washington testified that she heard and observed the gunshots from her parked vehicle.

{¶ 14} Washington testified that after she witnessed Fisher shoot and kill the victim, she drove away, fleeing the scene; Ransom was seated in the front passenger seat. According to Washington, as she approached Crawford's residence, Ransom told her to slow down and he pulled a large rifle out of the black duffle bag and began shooting at Crawford's house. Washington testified that she did not shoot at the home nor was Wilborn in her vehicle at that time. The State asked Washington to describe her conversations with Ransom after the shootings. She said that Ransom told her to "say nothing, keep [her] mouth closed, don't repeat nothing to nobody." (Tr. 958.)

**{¶ 15}** Lugo corroborated Washington's recollection of Fisher's movements prior to the shooting but testified that both Wilborn and Fisher exited her vehicle and sat in the Ford Fusion. She said that after Fisher finished his conversation in Washington's vehicle, he returned to the SUV and opened the passenger side door. Lugo stated, "At that point I had [the victim]'s number in my phone, [Fisher] tells me to stay by my phone. When everything was ready, that she would call me. He told [the victim] to try to get [Crawford] to come outside and at that point we'll rush in. And they shut the door and they start walking towards the park." (Tr. 1354.) Lugo testified that she then heard and saw two gunshots. She stated that Fisher jumped into the passenger seat of her car, and she drove off, following Washington's Ford Fusion. Contrary to Washington's testimony, Lugo testified that Wilborn switched vehicles at the park and was riding in Washington's vehicle at the time of the drive-by shooting. She stated that as they drove past Crawford's house, she observed "bullets start coming from [Washington's] car into the [victim's] house . . . and one large gun protruding from the window [that] looked like a rifle." (Tr. 1335.) She said that neither she nor Fisher shot at the house.

**{¶ 16}** Wilborn's GPS monitor placed him on East 107th and Elk Streets from 5:12 a.m. until 5:17 a.m.; it registered again at 5:18 a.m., heading toward East 108th Street, and then at 5:19 a.m. on East 110th. Accordingly, it is uncontroverted that Wilborn was with Lugo, Washington, Fisher, and Ransom when the victim was murdered and when Crawford's house was shot up. Wilborn's GPS monitor tracked him traveling back to the Union Avenue residence, arriving at 5:38 a.m.

and staying until approximately 5:47 a.m. His location is significant because although Washington testified that she drove Ransom back to the Union residence to "dro[p] off his gun," she testified that Wilborn was not with them at this time and she did not see him again until they went to Fisher's house on Harvard Avenue. Lugo, however, testified that everyone went back to the Union Avenue residence. Although Lugo stated that she did not see Ransom leave anything at the house, she said that they all went to there because "[Wilborn] had left his phone there so he went to pick his phone up." (Tr. 1357.)

{¶ 17} The group subsequently returned to Fisher's house on Harvard Avenue, where Wilborn stayed until approximately 9:00 a.m. that morning when Lugo drove him back to Akron. Later that day, Fisher, Ransom, Lugo, and Washington travelled to South Carolina, where they stayed for several days. The State introduced evidence that the group attended a Rollin' 20s Crips gang party where both Lugo and Washington were welcomed as new gang members based on their roles during the murder.

## B. The Investigation

### 1. Crawford's Residence

{¶ 18} Following calls for shots fired on East 108th Street, police responded to the Crawford residence and observed bullet holes on the exterior of the home as well as damage to the inside of the home. Police discovered twelve .223-caliber shell casings and seven .380-caliber shell casings near the street. The shell casings were collected and submitted to the National Integrated Ballistic Information

Network ("NIBIN"). The shell casings, however, were not swabbed or submitted for DNA testing before they underwent ballistics testing. The police did not recover any bullets or bullet fragments from inside the Crawford residence.

{¶ 19} James Kooser, a forensic scientist with the Cuyahoga County Regional Forensic Science Laboratory, confirmed that all 12 of the .223 cartridge cases were fired from the same unknown firearm. His report, however, did not reveal that he compared the seven .380 casings to determine whether they were fired from the same gun. On cross-examination, he admitted that the spent shell casings investigators subsequently discovered in Ransom's apartment did not match the .223 casings found at the scene of the shooting.

## 2. The Victim's Body Is Discovered

{¶ 20} Around noon on April 8, 2021, the victim's body was discovered in Martin Luther King Jr. Park. Dr. Joseph Felo, the Chief Deputy Medical Examiner for the Cuyahoga County Medical Examiner's Office, performed an autopsy on the victim, during which he removed two medium-caliber bullet fragments from her body. He testified that the victim sustained independently fatal gunshot wounds to her head and chest, and a defensive gunshot wound to her left forearm. Dr. Felo ruled her death as a homicide.

{¶ 21} Kooser testified that the bullets recovered from the victim's body were consistent with having been fired from an unknown ".38 special or 357 magnum-caliber revolver." (Tr 1249.)

### 3. The Parties are Identified

{¶ 22} Based on video footage recovered from nearby residences and the City of Cleveland, investigators learned that multiple vehicles were involved in the shooting, including a small black Toyota Rav4 SUV and a red sedan, later discovered to be a Ford Fusion. Agent Cristin McCaskill testified that the SUV was registered in the name of an individual who shared a listed address with Fisher. The SUV was discovered on April 13, 2021, and subsequently swabbed for DNA. Fisher's, Lugo's, and the victim's DNA were discovered inside the vehicle. Subsequent forensic investigations revealed that on the day the police detained Fisher, Ransom sent a Facebook message, stating, "Police just got P Dup [Fisher]." (Tr. 1526 and 2011.)

{¶ 23} During Fisher's interview with police, he admitted to meeting the victim, but denied any further involvement. He invited officers to check his location data from his cell phone to prove that he was not present in the area at the time of the murder. A subsequent search of his cell phone revealed text messages that he sent to both Ransom and Wilborn giving them the Union Avenue address. Police also discovered videos on Fisher's phone showing individuals wearing gang colors and fist fighting. According to Detective John Dayton of the Cleveland Police Department, these fights are consistent with Rollin' 20s Crips gang initiations.

{¶ 24} Following their interview with Fisher, the police questioned Lugo; she was subsequently arrested. During her direct examination, Lugo admitted to

lying to the police multiple times about her and others' involvement in the planned robbery, murder of the victim, and subsequent drive-by shooting. She finally admitted during her proffer statement that she, the victim, Ransom, Washington, Wilborn, and Fisher drove to the East 108th Street address to complete a robbery that was planned by Fisher and the victim. Lugo maintained that she initially lied to the police because she was scared of "the guys who did the killing and shooting," and if "they did this to [the victim] what were they going to do to [her]" if she cooperated with police. (Tr. 1348.)

{¶ 25} In October 2021, the investigators identified Washington as the driver of the red Ford Fusion; police arrested her on January 19, 2022. Washington similarly admitted on direct examination that she was not truthful with the police following her arrest. Like Lugo, Washington conceded that she provided five or six different versions of the incident before identifying Fisher and Ransom as the shooters. She said that she lied to the police to protect Ransom because she was pregnant and believed Ransom to be the father.

{¶ 26} Detective Dayton testified that Ransom was arrested in March 2022, after Washington linked him to the shooting. At the time of his arrest, Ransom confirmed that he resided at the East 40th Street apartment with L.P. throughout 2021. He also admitted to knowing Fisher and Lugo but denied ever meeting the victim.

{¶ 27} The police seized two cell phones from Ransom. On one of his phones, there was a text message sent to Fisher on December 24, 2020, that

contained a photograph of Ransom with a handgun and black and tan AR platform rifle that was loaded with a magazine. Ransom later sent the photograph to a second individual and stated, "[D]on't show nobody." (Tr. 1555.) Additionally, police discovered another text conversation dated March 23, 2022, which was after Washington's arrest, in which Ransom contacted a gunsmith, asking whether he had "a 556 NATO firing pin and attachments." (Tr. 1558, State's exhibit No. 935.) Agent Burke explained that the message indicated that Ransom was "looking to purchase specific parts of a rifle that would change those characteristics ballistically." (Tr. 1558.) This was of significance because Agent Kooser testified that .223-caliber ammunition could be fired from a 556 firearm. (Tr. 1255.)

{¶ 28} A search of Ransom's Facebook messages revealed messages he sent on the morning of April 8, 2021, in which he said, "I left my phone at Shay house I told u what we was on." In a text message that Ransom sent to L.P. at 7:31 a.m., on April 8, 2021, he said: "I'm cool baby. Didn't go the way we wanted it to. I'm at [Fisher's] spot."

{¶ 29} Agent McCaskill testified that she participated in the execution of a search warrant at the East 40th Street apartment complex on March 25, 2022. During the search of the apartment, the investigators were attempting to locate a wooden table that was observable in Ransom's photograph of the rifle. Ultimately, the investigators confirmed that there was a similar wooden table in the apartment. The investigators also recovered a wallet containing Ransom's driver's license and social security card, an empty gun box, spent shell casings, a rifle

magazine, and ammunition that was capable of being fired by the rifle depicted in Ransom's social media photograph. Neither the handgun nor the rifle was discovered. Subsequent forensic testing revealed that the ammunition discovered did not match the spent shell casings from the Crawford residence.

### 4. Wilborn's Involvement

{¶ 30} The police discovered Wilborn's involvement in the planned robbery following an interview with Washington. She could not recall Wilborn's name and only provided a vague physical description of him. Subsequently, the police discovered that Ransom and Fisher each had a contact in their cell phones named "Killz," and that each had sent text messages to "Killz" on the night of April 7, 2021, telling him about the gathering at the Union Avenue residence.

{¶ 31} This stood out to the investigators because the plan to rob Crawford materialized at the Union Avenue residence. After the police confirmed that the phone number associated with the contact "Killz" was registered to Wilborn, Lugo confirmed his involvement in the shootings by identifying him in a photo array. The investigators then learned that Wilborn was wearing a GPS ankle monitor during the duration of the incident, allowing the investigators to map his precise movements before, during, and after the shootings.

{¶ 32} The GPS data confirmed that Wilborn went to the residences located on Union Avenue, Harvard Avenue, and East 40th Street. The data further confirmed Wilborn's presence at the scene of the homicide at East 107th Street and Elk Avenue and the shooting thereafter on East 108th Street.

{¶ 33} Det. Dayton and Special Agent Burke interviewed Wilborn at a federal penitentiary in Pennsylvania. Det. Dayton testified that prison officials created a "ruse" to allow him and Agent Burke to speak with Wilborn without the presence of another inmate. According to Det. Dayton, when an inmate is affiliated with a gang, another gang member accompanies that inmate to ensure that the inmate does not "snitch." He admitted that although Wilborn was not serving "gang time," he was concerned for Wilborn's safety. During the interview, Wilborn admitted that he was a former "Rollin' 20s Crips" gang member but said he had left the gang. He further admitted seeing Ransom before, but denied knowing Fisher, Lugo, Washington, or the victim. Det. Dayton testified that Wilborn was uncooperative and denied any involvement in the events on April 8, 2021. According to Det. Dayton, Wilborn stated that he was intoxicated and if he did not have knowledge of the events, he could not be charged.

{¶ 34} On cross-examination, Det. Dayton admitted that (1) Wilborn's DNA was not found on any items connected to the murder or drive-by shooting; and that (2) Wilborn was not included in any Facebook groups chats discussing the police investigation, did not accompany the group to South Carolina, and was not in any pictures with any gang members.

### III. The Verdict

{¶ 35} The trial court found Wilborn guilty of involuntary manslaughter, a felony of the first degree, including the attendant one-year, three-year, and 54-month firearm specifications, repeat violent offender specification, and notice of

prior conviction (Count 39); having weapons while under disability, a third-degree felony, including the attendant one-year, three-year, and 54-month firearm specifications (Count 42); and use of a firearm or dangerous ordnance by a violent career criminal, a first-degree felony (Count 43). He was acquitted of all remaining counts and specifications. The trial court sentenced Wilborn to a total aggregate sentence of 18.5 years and a maximum sentence, pursuant to the Reagan Tokes Law, of 22.5 years.

{¶ 36} Wilborn now appeals, raising one assignment of error in which he contends that the State presented insufficient evidence to support his convictions for involuntary manslaughter, having weapons while under disability, and use of a firearm by a violent career criminal. Alternatively, he contends that his convictions are against the manifest weight of the evidence.

## IV. The Appeal

### A. Standards of Review

{¶ 37} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Cottingham*, 2020-Ohio-4220, ¶ 32 (8th Dist.). An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶ 38} Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.). Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

{¶ 39} In contrast to a challenge based on sufficiency of the evidence, "[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, at 387. In our manifest-weight review of a bench trial verdict, we recognize that the trial court serves as the factfinder, and not the jury. *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.). "'When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt.'" *State v. Worship*, 2022-Ohio-52, ¶ 34 (12th Dist.), quoting *State v. Tranovich*, 2009-Ohio-2338, ¶ 7 (12th Dist.). To warrant reversal from a bench trial under a

manifest-weight-of-the-evidence claim, this court must determine that "the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Crenshaw* at *id.* "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against the conviction.'" *Id.*, quoting *Thompkins* at 387.

{¶ 40} Although sufficiency and manifest weight are different legal concepts, manifest weight subsumes sufficiency in conducting the legal analysis; that is, a finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also dispose of the issue of sufficiency. *State v. Jackson*, 2015-Ohio-1946, ¶ 11 (8th Dist.), citing *Thompkins*.

## B. Wilborn's Argument

{¶ 41} Wilborn contends that the evidence does not support his conviction for involuntary manslaughter because he did not shoot the victim nor did he aid and abet Fisher when he shot the victim. He states that it is unclear whether the trial court found him guilty of the weapon offenses as the principal offender or under a complicity theory, but regardless under which theory he was found guilty, the evidence does not support his convictions for having weapons while under disability and use of a firearm by a career violent criminal because (1) he did not take an active role as an accomplice in the commission of those offenses, and (2)

to find that he actually fired a weapon would require impermissible inference stacking.

{¶ 42} Ohio's complicity statute, R.C. 2923.03(A), provides, in relevant part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . aid or abet another in committing the offense."

{¶ 43} The statute does not define "aid or abet," but the Ohio Supreme Court has stated that to aid or abet is "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001), quoting *Black's Law Dictionary* (7th Ed. 1999). "A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Seals*, 2015-Ohio-517, ¶ 34 (8th Dist.), citing *Johnson* at syllabus. Aiding and abetting may be shown by both direct and circumstantial evidence, and "'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971).

{¶ 44} "The mere presence of an accused at the scene of a crime, however, is insufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). The Ohio Supreme Court has interpreted this rule to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission. *Johnson* at

¶ 245. As will be discussed, Wilborn was not merely an innocent bystander to the events that led to his indictment.

{¶ 45} R.C. 2923.03(F) provides that anyone who violates the complicity statute "shall be prosecuted and punished as if he were a principal offender." *See State v. Jackson*, 90 Ohio App.3d 702, 705 (6th Dist. 1993) ("The complicity statute treats the accomplice as though he was the one who committed every act of the underlying principal offense."). Prosecution and punishment include any and all sentencing enhancements. *State v. Fulton*, 2011-Ohio-4259, ¶ 42 (8th Dist.), citing *State v. Chapman*, 21 Ohio St.3d 41 (1986), syllabus; *State v. Moore*, 16 Ohio St.3d 30, 33 (1985) (holding that an unarmed accomplice to aggravated robbery is subject to a mandatory three-year term of incarceration on a firearm specification). An offender need not be charged under R.C. 2923.03, but instead may be charged with complicity in terms of the principal offense. Therefore, the State is not required to explicitly allege complicity. *State v. Skatzes*, 2004-Ohio-6391, ¶ 32.

{¶ 46} Wilborn was not charged with complicity under the statute but was charged with the principal offenses, including firearm specifications. Accordingly, the State needed to prove that either Wilborn (1) committed the offenses as the principal offender, or (2) aided and abetted his codefendants in the commission of the offenses. For ease of discussion, we address Wilborn's weapon offenses first.

{¶ 47} Wilborn was convicted of Count 42, having weapons while under disability, in violation of R.C. 2923.13(A)(2), which provides that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly

acquire, have, carry, or use any firearm or dangerous ordnance, if . . . (2) [t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence."

{¶ 48} The trial court also found Wilborn guilty of Count 43, use of a firearm or dangerous ordnance by a violent career criminal, in violation of R.C. 2923.132(B), which provides, that "[n]o violent career criminal shall knowingly use any firearm or dangerous ordnance." A "violent career criminal" is defined as "a person who within the preceding eight years . . . has been convicted of or pleaded guilty to two or more violent felony offenses that are separated by intervening sentences and are not so closely related to each other and connected in time and place that they constitute a course of criminal conduct." R.C. 2923.132(A)(1).

{¶ 49} Wilborn, Fisher, and Ransom stipulated that they all had prior felony convictions; thus, each were legally precluded from knowingly acquiring, having, carrying, or using a firearm. Wilborn also stipulated that he satisfied the definition of "violent career criminal." (Exhibit No. 252.) A stipulation that a defendant has a prior felony offense of violence conviction "relieve[s] the state of its burden of proving the prior conviction element of the weapons-under-disability charge." *State v. McLaughlin*, 2020-Ohio-969, ¶ 56 (12th Dist.). Accordingly, the issue is whether the State proved that Wilborn knowingly "acquired, had, carried,

or used any firearm," as required by R.C. 2923.13 or "use[d] any firearm or dangerous ordnance," as required by R.C. 2923.132.

{¶ 50} The State conceded at trial that no one saw Wilborn actually possess or use a gun. Accordingly, the State contended that either (1) circumstantial inferences proved that Wilborn used a firearm; or (2) Wilborn, as an accomplice, used a firearm by virtue of his codefendants' possession and use of a firearm.

{¶ 51} Regarding the first theory — that circumstantial inferences prove that Wilborn fired a weapon — the State contended during trial that the seven .380 shell casings found in the street in front of Crawford's residence were fired by Wilborn from a second unknown gun. Wilborn contends that the State's theory was based on impermissible inference stacking.

{¶ 52} Whether a conviction is based on inference stacking goes to the sufficiency of the evidence. *State v. Jones*, 2020-Ohio-3367, ¶ 66 (8th Dist.). Ohio law generally precludes the stacking of inferences to prove a claim. *State v. Brown*, 2018-Ohio-3674, ¶ 19 (8th Dist.), citing *Estate of Bier v. Am. Biltrite*, 2012-Ohio-1195, ¶ 22 (8th Dist.). "An inference which is based solely and entirely upon another inference and which is unsupported by any additional fact or another inference from other facts is an inference upon an inference and is universally condemned." *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St.3d 329 (1955), paragraph one of the syllabus; *Davis v. Cuyahoga Metro. Hous. Auth.*, 2012-Ohio-3077, ¶ 13 (8th Dist.).

{¶ 53} There are two instances, however, when the rule against inference stacking does not apply. The first is when "[a]n inference which is based in part upon another inference and in part upon factual support is called a parallel inference and is universally approved provided it is a reasonable conclusion for the jury to deduce." *Id*. at paragraph three of the syllabus. The second is when multiple inferences arise separately from the same set of facts. *McDougall v. Glenn Cartage Co.*, 169 Ohio St. 522 (1959), paragraph two of the syllabus.

{¶ 54} Based on our review of the record, the State's theory would require impermissible inference stacking. The first inference requires the trier of fact to infer that the seven spent .380 shell casings found in the street were from the drive-by shooting that occurred earlier that day. However, the State did not present any evidence that another firearm was observed, used, or recovered during the drive-by shooting or that the seven casings were fired from the same weapon. Furthermore, the police did not recover any .380 bullet fragments from inside the Crawford residence to demonstrate that a .380 firearm was used.

{¶ 55} The next inference the trier of fact would need to make to support the State's theory would be that Wilborn shot the unknown firearm into the house. No one testified to seeing Wilborn with a firearm that evening or that he shot from a vehicle at Crawford's residence. The State merely maintained that because a different caliber of casings was found in the street, Wilborn must have also shot a weapon. This theory is unsupported by any fact or set of facts.

{¶ 56} In comparison, direct and circumstantial evidence supported the State's theory that the twelve spent .223-caliber casings originated from Ransom's actions of possessing and shooting at Crawford's residence. Washington testified that she saw Ransom pull a rifle from the duffel bag and fire into the Crawford home. Additionally, Kooser testified that the discovered .223-caliber ammunition could be fired from a 556 rifle, the same type of firearm about which Ransom contacted a gunsmith, inquiring about the replacement of a firing pin, and the same type of firearm that investigators discovered in photographs in Ransom's apartment.

{¶ 57} Accordingly, the State's theory that Wilborn possessed and discharged a firearm from a vehicle into Crawford's residence is based on impermissible inference stacking and his convictions for having weapons while under disability and use of a firearm by a violent career criminal would not be supported by sufficient evidence under this theory.

{¶ 58} As noted above, however, the State also proceeded under a theory that Wilborn, as an accomplice, used a firearm by virtue of his codefendants' possession and use of a firearm. Wilborn contends that the evidence failed to demonstrate that he aided and abetted his codefendants. He maintains that the evidence demonstrated that he did not take an active role but was merely present

during the commission of the offenses. He makes this same argument regarding his convictions for involuntary manslaughter.[2]

{¶ 59} "In Ohio, there is no difference between those convicted of complicity in a crime or as a principal offender." *State v. Crosby*, 2018-Ohio-3793, ¶ 9 (8th Dist.). The actions of the principal are imputed to the accomplice, and the accomplice may be found to have committed every element of the offense committed by the principal, including possession and use of a weapon. *State v. Frost*, 2005-Ohio-5510 (2d Dist.); s*ee also State v. Alexander*, 2013-Ohio-2533 (8th Dist.). The principal's legal disability or legal status, however, cannot be imputed on the accomplice in charges involving certain weapons offenses. *State v. Adams*, 2010-Ohio-4478 (8th Dist.).

{¶ 60} Ohio courts, including the Ohio Supreme Court and this court, have affirmed convictions for possession and use of weapons under a theory of aiding and abetting in the commission of the underlying offenses. *See Johnson*, 93 Ohio St.3d at 243 (convictions upheld where defendant-gang member aided and abetted the principal in killing a rival gang member even though no witness pinpointed a specific statement by defendant of his intent to commit the murder); *Adams* (defendant-accomplice's convictions, including having weapons while under

---

[2] Wilborn was convicted of Count 39, involuntary manslaughter, in violation of R.C. 2903.04(A), which provides, in relevant part, "No person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." In this case, the State identified the felony predicate offense as having weapons while under disability.

disability, upheld even though the principal offender was the person who actually used the gun); *State v. Reed*, 2010-Ohio-1866 (8th Dist.) (accomplice-defendant's convictions upheld even though he was not the shooter, but an active participant in the crimes); *State v. Dalmida*, 2015-Ohio-4995 (1st Dist.) (an accomplice can be convicted of having weapons while under disability without holding the firearm if that accomplice aided and abetted the person who actually used the firearm). Accordingly, the question in this case is whether the State proved that Wilborn's conduct was sufficient to support its theory that he aided and abetted his codefendants when Fisher shot the victim and Ransom shot up Crawford's residence.

{¶ 61} The State's evidence established that Wilborn intended to participate in the armed robbery of Crawford's residence. Even if Wilborn was not involved in the early planning of the robbery, he voluntarily traveled from Akron to Cleveland at the request of Fisher and then accompanied his codefendants to facilitate the armed robbery. Once it was believed that the victim was actually conspiring against them, Fisher, Ransom, and Wilborn, either collectively or a combination thereof, discussed this new development at the park. Both Lugo and Washington testified that Wilborn exited Lugo's vehicle and had a discussion with Ransom. Lugo testified further that when Wilborn exited her vehicle, Fisher accompanied him and they both sat in Washington's vehicle with Ransom. According to Washington, Fisher discussed with Ransom that they were being "double crossed" and they had to kill the victim. Although the women gave

conflicting testimony about Wilborn's presence during this conversation, the State presented some evidence that Wilborn was present during the conversation between Ransom and Fisher about killing the victim.

{¶ 62} Immediately after these conversations, Fisher walked back to the SUV, walked the victim to the park, and shot her twice. The group then fled the area and Ransom shot into the Crawford residence. The occupants of the vehicles then traveled back to the Union Avenue house for Wilborn to retrieve his cell phone and for Ransom to return his duffel bag that contained his firearm. The group then went to Fisher's house on Harvard, where they stayed for several hours before Lugo drove Wilborn back to Akron. Later, Wilborn's codefendants traveled to South Carolina for a gang initiation party. Accordingly, contrary to Wilborn's position on appeal, he was not merely present at the scene, but an accomplice who actively assisted and supported his codefendants

{¶ 63} Moreover, we note that at no time did Wilborn assert that he abandoned his role or involvement of the crimes once the planned robbery was stymied. In fact, no evidence or suggestion was presented that he attempted to dissuade Fisher or Wilborn from killing the victim nor that he manifested any renunciation of his involvement in the crimes or informed the authorities of the murder. *See* R.C. 2923.03(E) (affirmative defense exists that defendant terminated his complicity by manifesting a complete and voluntary renunciation of criminal purpose).

## V. Conclusion

{¶ 64} Wilborn conceded that he was under a disability that legally precluded him from acquiring, having, carrying, or using a firearm. The State provided sufficient evidence to prove that Wilborn acted as an accomplice by supporting and assisting in the plan to rob the Crawford residence, a plan that pivoted and resulted in the death of the victim, when Wilborn and his codefendants came to believe that the victim was actually conspiring against them. Accordingly, when Fisher shot and killed the victim, his culpability was imputed to Wilborn, and the trial court could have reasonably found Wilborn guilty of involuntary manslaughter with the predicate offense of having weapons while under disability. Moreover, under the complicity theory, either Fisher's actions when he shot the victim or Ransom's actions when he discharged his firearm into Crawford's house supported Wilborn's convictions for having weapons while under disability and using a firearm by a career criminal.

{¶ 65} Based on the foregoing, we find that the direct and circumstantial evidence, and any reasonable inferences that could be made therefrom, sufficiently supported Wilborn's convictions. Additionally, this court has reviewed the evidence presented at trial, and we conclude that the trial court did not lose its way and create a manifest miscarriage of justice in finding Wilborn guilty of involuntary manslaughter, having weapons while under disability, and use of a firearm or dangerous ordnance by a violent career criminal. This is not the exceptional case where the evidence weighs heavily against the factfinder's verdict, requiring this

court to step in, reverse the judgment of the trial court, and order a new trial. Wilborn's assignment of error is overruled.

{¶ 66} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR