[Cite as *State v. Clark*, 2025-Ohio-5342.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

      Plaintiff- Appellee,          :

                                        No. 114808

      v.                             :

SUNLEAF CLARK,                           :

      Defendant-Appellant.          :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 26, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-687976-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Morgan Austin, Assistant Prosecuting Attorney, *for appellee.*

Law Office of Timothy Farrell Sweeney and Timothy F. Sweeney, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Sunleaf Clark ("Clark") appeals from her conviction and sentence for one count of felonious assault, a felony of the second

degree. Clark's conviction relates to a shooting that occurred on August 13, 2023, committed by her son, Jayse Fitch ("Jayse"), which seriously injured a female juvenile victim.

{¶ 2} Clark was alleged to have aided and abetted Jayse in the commission of this offense and was convicted after a jury trial. Clark alleges that the trial court's instructions concerning complicity were incorrect, that her conviction was not supported by sufficient evidence, and that her conviction was against the manifest weight of the evidence. Upon reviewing the record and the relevant law, we affirm her conviction and overrule Clark's three assignments of error.

## I. Background Overview

{¶ 3} It is undisputed that on August 13, 2023, Jayse fired multiple gunshots toward R.A.'s house, seriously injuring R.A.'s niece.[1]  But the facts that ultimately led to this offense began long before those bullets were fired.  Tensions between Clark's family and R.A.'s family began years earlier when R.A. forbade her daughter J.S. from spending time with Clark's daughter M.P.[2]  These tensions culminated in a physical altercation between Clark and R.A. at their daughters' cheerleading competition on August 13, 2023.  The altercation ultimately led to Jayse firing multiple shots toward R.A.'s home and her family.  A bullet grazed the ankle of R.A.'s

---

[1] Pursuant to Loc.App.R. 13.2(B), initials will be used throughout this opinion to protect the identity of juveniles involved in this matter.

[2] Trial testimony established Clark has four children:  28-year-old daughter Jasmine Fitch; 23-year-old son Jayse Fitch; 18-year-old daughter A.J.; and 13-year-old daughter M.P.  (A.J. and M.P. were juveniles at the time of the incident.)

daughter, J.S. R.A.'s niece, K.A., was struck four times requiring her to undergo two separate surgeries because two bullets had lodged inside her intestines.

**Relevant Trial Testimony**

{¶ 4} The testimony presented at trial demonstrated that Clark's daughter, M.P., and R.A.'s daughter, J.S., used to be best friends from preschool until approximately fourth grade. The families lived within walking distance of each other. R.A. testified that M.P. used to cause J.S. to get into trouble at school. As a result, R.A. instructed J.S. to no longer be friends with M.P. Because of the estranged relationship, the two girls kept getting into fights at school, so R.A. transferred J.S. to another school.

{¶ 5} On the day of the shooting, a cheerleading competition was held at a football field known as Bump Taylor Field. M.P. and J.S. competed on different teams. R.A. testified that M.P. and J.S. used to be on the same cheerleading team, but M.P. had been removed from the team because of issues she had with J.S. When the competition was over, R.A. stated that J.S. and J.S.'s coach approached her. J.S. informed her mom that Clark told her that "she was going to get her jumped" and that Clark had called J.S. "bitches and hoes." R.A. confronted Clark. A physical fight captured on video ensued between Clark and R.A. Clark's daughters A.J. and M.P. jumped into the fight; J.S. also joined the fight.

{¶ 6} When the fight ended, each family left the area. Clark's daughter, A.J., testified that as Clark drove past R.A.'s house, A.J. jumped out of her mom's car travelling at about 15 – 20 miles per hour, and broke out the front window of

R.A.'s house. Afterwards, Clark, A.J., and M.P. headed back to the field to look for Clark's cell phone she lost after the initial fight.

{¶ 7} A.J. testified that Clark did not tell her to break the window, but when R.A. returned to Bump Taylor Field to file a police report about the broken window, R.A. testified she confronted Clark and Clark "smirked and laughed." While at Bump Taylor Field, M.P. and J.S. began fighting again. The fight was broken up by police. In response to her window being broken out, R.A. went to Clark's house and broke out Clark's windows.

{¶ 8} During the confrontations, no one disputes that Clark had lost her cell phone and did not find it until later that night. A.J. stated that during this time, A.J. called her older sister Jasmine Fitch ("Jasmine") and brother Jayse from her phone to tell them what happened. Cell phone records introduced at trial indicate that multiple phone calls were made between A.J.'s and Jayse's cell phones. Cell phone records further indicated that Jayse attempted to call Clark but the call did not connect.

{¶ 9} R.A. testified that after she returned home, she heard tires screeching. She ran outside to the porch with other members of her family. R.A. stated that she saw Clark in a black car. Clark yelled out, "There them bitches go."[3] At this time, Jayse jumped out of his car with a gun and began shooting at R.A.'s house. One

---

[3] Testimony between multiple witnesses differed slightly on this point. J.S. testified that Clark pointed and yelled, "There go them bitches right there." T.A. testified that Clark jumped out of the car and yelled, "That's them bitches right there." K.A. testified that Clark said, "That's the house."

bullet grazed J.S.'s ankle.  K.A. was shot four times, requiring her to undergo two surgeries.

{¶ 10} Clark's oldest daughter, Jasmine, testified that she had received a call from her brother, Jayse, telling her that their mother, Clark, had been jumped. Jasmine also testified that her sister, A.J., called her to tell her that Clark had been jumped.  Jasmine stated that she drove over to Bump Taylor Field with her two-year-old son.  When Jasmine arrived at the field, she observed that it was blocked off.  She eventually saw Clark in the church parking lot across the street so she pulled up and met with Clark.  Jasmine testified that after about ten minutes, she left to follow Clark to Clark's house.

{¶ 11} Jasmine testified that while driving to Clark's house, she saw a large black male in the front yard of R.A.'s house with a gun.  She heard shooting and quickly attempted to flee the area.

{¶ 12} After the shooting occurred, A.J. testified that Jayse called her and told her and Clark not to go home. A.J. put Jayse on speaker phone and heard Clark repeatedly ask Jayse, "[W]hy would you just do that?"

{¶ 13} In January 2024, Clark and Jayse were charged in a seven-count indictment.  The indictment charged Clark and Jayse with the following offenses:

1. Improperly discharging a firearm at or into a habitation or a school safety zone, in violation of R.C. 2923.161(A)(1), a felony of the second degree, with one- and three- year firearm specifications
   - did knowingly discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of [R.A.]

2. Felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree, with one- and three-year firearm specifications
   - did knowingly cause serious physical harm to [K.A.]

3. Felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with one- and three-year firearm specifications
   - did knowingly cause serious physical harm to [K.A.] by means of a deadly or dangerous ordnance, to wit: firearm

4. Felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with one- and three-year firearm specifications
   - did knowingly cause or attempt to cause physical harm to [J.S.] by means of a deadly or dangerous ordnance, to wit: firearm

5. Felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with one- and three-year firearm specifications
   - did knowingly cause or attempt to cause physical harm to [R.A.] by means of a deadly or dangerous ordnance, to wit: firearm

6. Felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with one- and three-year firearm specifications
   - did knowingly cause or attempt to cause physical harm to [T.A.] by means of a deadly weapon or dangerous ordnance, to wit: firearm

7. Criminal damaging or endangering, a misdemeanor of the second degree
   - did cause or create a substantial risk of physical harm, by any means, to property of [M.M.], to wit: Kia Soul, without her consent

{¶ 14} Jayse entered a plea of no contest to each count set forth in the indictment, along with the attendant firearm specifications on Counts 1 – 7. He was ultimately sentenced to a total prison term of 12 to 15 years.

{¶ 15} With respect to Clark, the matter proceeded with a jury trial in December 2024. The State's theory of the case was that Clark was complicit in aiding and abetting Jayse in the commission of these offenses. The jury ultimately returned a verdict finding Clark guilty of felonious assault as set forth in Count 2 of the indictment. She was found not guilty of the attendant firearm specifications. The jury also returned a verdict of not guilty to Counts 1, 3, 4, 5, and 6. The trial court granted Clark's Crim.R. 29 motion for acquittal with respect to Count 7.

{¶ 16} The trial court sentenced Clark to an indefinite prison term of a minimum of two years in prison and a maximum of three years.

{¶ 17} Clark has appealed her conviction and sentence, challenging the instructions the trial court gave to the jury with respect to complicity, alleging that the State presented insufficient evidence to support her conviction for felonious assault, and that even if the evidence was sufficient to support her conviction, her conviction for assault was against the manifest weight of the evidence.

II. Law and Analysis

A. Complicity Jury Instructions

{¶ 18} In her first assigned error for review, Clark challenges the trial court's instructions to the jury with respect to complicity. At trial, Clark filed a request for jury instructions on complicity. Relevant to this appeal, Clark's proposed jury

instructions requested the phrase "aided and abetted" be defined to the jury as follows:

> Before you can find the defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt that the defendant *knowingly* and willfully supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in the commission of the offense and that the defendant *shared the criminal intent of the principal offender*.

(Emphasis added.)

{¶ 19} The trial court denied Clark's proposed instructions. The instructions provided to the jury with respect to complicity were read as follows:

> Complicity, aiding and abetting.
>
> It is the contention of the State that the Defendant aided and abetted the person who did directly or personally committed the offenses as charged in the indictment.
>
> Aid means to help, assist or strengthen.
>
> Abet means to encourage, counsel, incite or assist.
>
> Ordinarily where a crime is committed by more than one person, each person is regarded as if she were the principal offender and is as guilty as if she personally performed the crime.
>
> A person, who acts in concert with the principal, with the intent to aid the principal in the performance of an act or commission of a crime is regarded as the aider and abettor.
>
> Whoever aids and abets or assists in procuring with another to commit an offense may be prosecuted as if she were the principal offender.
>
> When two or more persons have a common purpose to commit a crime, and one does one part and the second performs another, those acting together are equally guilty of the crime.

The Court instructs you, as a matter of law, that if you find beyond a reasonable doubt that the crime was committed, it is not necessary that you find the Defendant actually, personally and with her own hands committed the offense.

If you find the Defendant formed a joint design and purpose with another person to commit such a crime, either procured or aided and abetted or assisted such person in the commission of the crime, in pursuance of such a previously formed common design and purpose, then the Defendant would be guilty of the crime so committed and may be convicted under this indictment of the crime as charged herein.

To prove aiding and abetting; however, direct and circumstantial evidence may be introduced; therefore, participation and criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.

In other words, there must be proof the Defendant had in some way participated in or been a part of the act or acts committed.

The mere physical presence of a person does not in and of itself constitute aiding and abetting if the person performed no act in furtherance of the commission of the crime.

Aid means to help, assist, direct or strengthen

Abet means to encourage, counsel, incite or assist.

{¶ 20} Clark asserts that these instructions were incomplete because they 1) fail to provide the jury with a clear statement as to the "knowingly" mens rea requirement for complicity, and 2) fail to include a statement to the jury that to be found complicit, the jury must find Clark "shared the criminal intent of the principal."

### 1. Standard of Review

{¶ 21} Generally, "[t]rial courts have broad discretion in determining whether the evidence presented at trial was sufficient to warrant a particular jury instruction." *State v. Echevarria,* 2018-Ohio-1193, ¶ 27 (8th Dist.), citing *State v. Williams,* 2015-Ohio-172, ¶ 35 (8th Dist.). Nonetheless, the instructions must "'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White,* 2015-Ohio-492, ¶ 46, quoting *State v. Comen,* 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Clark alleges that the jury instructions with respect to complicity are incomplete. As such, Clark presents us with a question of law that we review de novo. *State v. Mincey,* 2018-Ohio-662, ¶ 27 (1st Dist.) (noting that an appellant's claim that the trial court left out an element of complicity in its charge to the jury is an issue that is to be reviewed de novo); *see also Echevarria* at ¶ 27 (holding that "[w]hether jury instructions correctly state the law is a legal issue that an appellate court reviews de novo").

### 2. Applicable Law

{¶ 22} A requested jury instruction should be given "if it is a correct statement of the law, is applicable to the facts of the particular case and reasonable minds might reach the conclusion sought by the instruction." *Echevarria* at ¶ 28, citing *State v. Hinton,* 2014-Ohio-490, ¶ 34-35 (8th Dist.); *State v. Rose,* 2008-Ohio-1262, ¶ 18 (8th Dist.). But there is a limit. The Ohio Supreme Court has noted that "[n]o purpose is served, for instance, by requiring courts to present redundant

jury instructions or instructions that are so similar to other instructions to be presented as to be confusing." *State v. Griffin,* 2014-Ohio-4767, ¶ 5. A trial court is not required to give requested jury instructions verbatim "'but may use its own language to communicate the same legal principles to the jury.'" *State v. Sowell,* 2016-Ohio-8025, ¶ 134, quoting *State v. Group,* 2002-Ohio-7247, ¶ 108.

{¶ 23} Further, we may not ""'reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.""'" *Echevearria* at ¶ 29, quoting *State v. Shepherd,* 2016-Ohio-931, ¶ 25 (8th Dist.), quoting *State v. McKibbon,* 2002-Ohio-2041, ¶ 27 (1st Dist.). As such, Clark must also demonstrate that "she was prejudiced by the trial court's refusal to give the requested instruction. *Id.*

### 3. Analysis

{¶ 24} Complicity, as defined in R.C. 2923.03, provides, in relevant part:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

. . .

(2) Aid or abet another in committing the offense[.]

{¶ 25} Clark argues that the trial court omitted the mens rea elements with respect to complicity in its jury instructions. In reviewing Clark's claim, "we may not judge a single instruction in isolation, but rather in the context of the overall charge." *State v. Copeland,* 2016-Ohio-1537, ¶ 28 (8th Dist.), citing *State v. Madrigal,* 87 Ohio St.3d 378, 396 (2000). "Thus, we must consider the jury

instructions 'as a whole' and then determine whether the jury probably misled the jury in manner materially affecting the complaining party's substantial rights." *Id.*

{¶ 26} With respect to the issue raised by Clark, we have previously held that "a defendant is not prejudiced when a complicity instruction does not refer specifically to the culpable mental state if the instructions for the underlying offenses include the requisite mental state." *State v. Gibbs,* 2006-Ohio-175, ¶ 24 (8th Dist.), citing *State v. Head,* 2005-Ohio-3407, ¶ 31 (11th Dist.) (holding that "a trial court's complicity jury instruction properly stated the law where the court separately instructed the jury as to the culpable mental states of the underlying crimes"). *See also State v. Patterson,* 2018-Ohio-3348, ¶ 39 (1st Dist.) (stating that "[b]ecause the trial court had already instructed the jury regarding felonious assault, including the mens rea, the trial court was not required to repeat its earlier instruction when instructing on complicity").

{¶ 27} In reviewing the trial court's instructions as a whole, we note the trial court did instruct the jury on the culpable mental state necessary to convict Clark of the principal offense of felonious assault. In doing so, the trial court instructed:

> The Defendant, Sunleaf Clark, is charged with felonious assault in violation of R.C. 2903.11(A)(1) in Count 2 of the indictment.
>
> Before you can find [Clark] guilty, you must find beyond a reasonable doubt that on or about August 13, 2023, and in Cuyahoga County, Ohio, [Clark] did knowingly cause serious physical harm to [the victim, K.A.]

{¶ 28} The trial court also instructed the jury with respect the mental state of "knowingly":

A person acts knowingly regardless of purpose when the person is aware that the person's conduct will probably cause a certain result or be of a certain nature.

A person has knowledge of circumstances when the person is aware that such circumstances probably exist.

Because you cannot look into the mind of another, knowledge is determined from all facts and circumstances in evidence.

{¶ 29} And finally, with respect to the complicity instruction itself, the court included an instruction that read: "A person, who acts in concert with the principal, with *the intent to aid the principal in the performance of an act or commission of a crime* is regarded as the aider and abettor." (Emphasis added.)

{¶ 30} Clark argues that the trial court's instruction on complicity failed to include the requisite mens rea and that the instructions were contrary to the Ohio Jury Instructions ("OJI"). The fact that a court's "jury instruction did not mirror the [OJI] is inconsequential." *Simbo Props. v. M8 Realty, L.L.C.,* 2019-Ohio-4361, ¶ 26 (8th Dist.).[4] Rather, "[t]he proper inquiry is whether the instruction was proper." *Mincey,* 2018-Ohio-662, at ¶ 30 (1st Dist.).

{¶ 31} Considering the jury instructions as a whole, the trial court instructed the jury regarding felonious assault, including the mens rea required and its definition. The court was not required to repeat the mens rea instruction with respect to complicity. As a result, Clark was not prejudiced by the court's complicity

---

[4] While the OJI are helpful as an example of the generally accepted interpretation of Ohio statutes, OJI "are a product of the Ohio Judicial Conference and are not binding on the courts." *Id.,* citing *State v. Nucklos,* 2007-Ohio-1025, ¶ 57 (2d Dist.). Accord *State v. Gardner*, 2008-Ohio-2787, ¶ 97 (Lanzinger, J., dissenting).

instruction, since the jury was properly instructed as to the culpable mental state necessary for the principal offense of felonious assault. *See Gibbs,* 2006-Ohio-175, at ¶ 24 (8th Dist.).

{¶ 32} Accordingly, Clark's first assignment of error is overruled.

## B. Sufficiency

{¶ 33} In her second assigned error for review, Clark argues that the evidence was insufficient to support her conviction for felonious assault on complicity grounds.

### 1. Standard of Review

{¶ 34} "The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial." *State v. Wilborn,* 2024-Ohio-5003, ¶ 37 (8th Dist.), citing *State v. Cottingham,* ¶ 32 (8th Dist.). In reviewing a challenge based on sufficiency, we must "'determine whether the evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt.'" *State v. Webb,* 2025-Ohio-456, ¶ 9 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. A sufficiency review "is not a factual determination, but a question of law." *State v. Jackson,* 2025-Ohio-109, ¶ 25 (8th Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶ 35} When reviewing the evidence, we must keep in mind that "[p]roof of guilt may be supported 'by circumstantial evidence, real evidence, and direct evidence, or any combination of all three, and all three have equal probative value.'" *Wilborn* at ¶ 38, quoting *State v. Radano,* 2017-Ohio-1034, ¶ 35 (8th Dist.). And although each type of evidence has their obvious differences, "those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence." *Id.,* citing *State v. Cassano,* 2012-Ohio-4047, ¶ 13 (8th Dist.). Our review of the evidence is not to determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390.

**2. Applicable Law**

{¶ 36} There is no dispute that Clark's son, Jayse, discharged a firearm at R.A.'s house causing R.A.'s niece, K.A., to be shot four times. The State's theory of the case, however, is that Clark was complicit in the felonious assault committed by Jayse, which led to the serious injuries sustained by K.A.

{¶ 37} As discussed above, Ohio's complicity statute provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). A person convicted under the complicity statute "shall be prosecuted and punished as if [he or she] were a principal offender." R.C. 2923.03(F). "'A person is guilty of complicity if that person aids or abets another in committing an offense while acting with the kind of culpability required for the

commission of an offense.'" *State v. Crosby,* 2018-Ohio-3793, ¶ 12 (8th Dist.), quoting *State v. Moore,* 2004-Ohio-2320, ¶ 26 (7th Dist.).

{¶ 38} To support a conviction for complicity, "'"the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."'" *Jackson,* 2025-Ohio-109, at ¶ 29 (8th Dist.), quoting *State v. McFarland,* 2020-Ohio-3343, ¶ 27-29, quoting *State v. Johnson,* 93 Ohio St.3d 240 (2001), syllabus. "Aiding and abetting may be shown by both direct and circumstantial evidence, and '"participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed."'" *Wilborn,* 2024-Ohio-5003, at ¶ 43 (8th Dist.), quoting *Johnson* at 245, quoting *State v. Pruett,* 28 Ohio App.2d 29, 34 (4th Dist. 1971).

{¶ 39} However, "the mere presence of an accused at the scene of a crime . . . is insufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner,* 69 Ohio St.2d 267, 269 (1982). The purpose of this rule is "to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Wilborn* at ¶ 44, citing *Johnson* at 245.

### 3. Analysis

{¶ 40} Here, Clark argues that the State failed to present sufficient evidence to demonstrate that she knew Jayse had a firearm or that Jayse would use that firearm in the manner that he did. In support of her position, Clark cites *State v. Shabazz,* 2014-Ohio-1828 (8th Dist.). In *Shabazz,* a divided panel reversed a felony

murder conviction on sufficiency grounds because "[t]here was no evidence that [the defendant] was aware that [the principal] had a gun until the shot was fired." *Id.* at ¶ 31, citing to *Rosemond v. United States,* 572 U.S. 65 (2014).

{¶ 41} In *Crosby,* 2018-Ohio-3793, at ¶ 11 (8th Dist.), the panel distinguished *Shabazz,* noting that the *Shabazz* panel concluded there was no evidence that the defendant aided and abetted the principal in that particular case. The court found that *Shabazz* was inapplicable to cases where the evidence did demonstrate that the defendant aided and abetted the principal. *Id.* The *Crosby* panel further criticized the *Shabazz* court's reliance on *Rosemond,* finding *Rosemond* irrelevant with respect to a complicity inquiry under state law. The *Crosby* Court explained: "*Rosemond* specifically addressed the validity of a jury instruction with respect to violations of 18 U.S.C. 924(c). *Rosemond* is not a sweeping decision setting forth a new rule of constitutional law that can be applied to crimes under state law." *Id.,* citing *Vazquez-Castro v. United States,* 53 F.Supp.3d 514, 521 (D.P.R. 2014); *Cordero v. United States,* 2015 U.S. App. LEXIS 23112, *2 (2d Cir. Mar. 19, 2015); *Hughes v. Epps,* 561 Fed. Appx. 350, 354, fn. 4 (5th Cir. 2014) (*Rosemond* does not apply to state-law robbery crime); *see also Hicks v. State,* 295 Ga. 268, 273, fn. 3 (2014); *People v. Jordan,* 2016 Mich.App. LEXIS 1833, *3 (Oct. 11 2016) (noting that "*Rosemond* is limited to prosecutions for particular statutory federal offenses, is irrelevant to this case, and does not change the aiding-and-abetting standard in Michigan"); *State v. Ward,* 473 S.W.3d 686, 693 (Mo.App. 2015) (stating that "[n]othing in *Rosemond* suggests that its holding

rests on any constitutional requirement or has any application to state criminal laws on accomplice liability; rather, the Court's analysis was merely a question of federal interpretation of the federal aiding and abetting statute").

{¶ 42} Here, Clark alleges that the evidence fails to demonstrate that she knew that Jayse had a firearm or would use that firearm to shoot at the victims. We disagree. Viewing the evidence in a light most favorable to the State, there was sufficient circumstantial evidence presented at trial for a rational finder of fact to conclude otherwise.

{¶ 43} First, it can be inferred from the evidence that Clark had a motive to seek revenge against R.A. and her family. The testimony was undisputed there had been a strain between the two families, stemming from the broken friendship between J.S. and M.P. Tensions escalated on August 13, 2023, when Clark and R.A. engaged in a physical confrontation after the cheerleading event at Bump Taylor Field. R.A. testified that her daughter told her that Clark had threatened to "get her jumped" and called her "bitches and hoes." When R.A. confronted Clark about the alleged exchange, a fight broke out between R.A. and Clark, as well as their respective families. After the fight, as Clark drove past R.A.'s house, Clark's daughter, A.J., testified that she jumped out of Clark's vehicle traveling 15-20 miles per hour, broke out the front window of R.A.'s house, and returned to Clark's vehicle. A.J. stated that her mother never told her to break the window, but took it upon herself to get out of the car and do it. When R.A. later confronted Clark about the incident, R.A. said to her, "You had your daughter come over there and bust out my

windows." R.A. testified that Clark responded by smirking and laughing. Afterwards, and prior to the shooting, R.A. went to Clark's house and broke out her windows. As such, a reasonable jury could conclude that Clark had a motive for revenge against R.A. and her family.

{¶ 44} Second, a reasonable finder of fact could infer from the evidence presented that Clark was in contact with Jayse prior to, and leading up to the shooting. A.J. testified that after the fight at Bump Taylor Field, Clark had lost her cell phone. Clark's phone was not found until later that day, after the shooting had occurred. Jayse's phone records were introduced at trial. They reveal that around the time of the shooting, Jayse made a number of calls to A.J., who was with Clark at the time. The records also indicate that Jayse attempted to call Clark but did not connect.

{¶ 45} Third, multiple witnesses testified just before the shooting occurred, Clark pulled up in front of R.A.'s house, pointed, and yelled something to the extent of "[t]here them bitches go." At this time, Jayse jumped out of his car with a gun and began shooting at R.A.'s house. One bullet grazed J.S.'s ankle. K.A. was shot four times, requiring her to undergo two surgeries. Jasmine, Clark's daughter who was at the scene and driving a separate vehicle, testified that she was not surprised that Jayse would shoot at R.A.'s house and that she was not shocked to have seen him out there doing just that. Jasmine stated that Jayse had just received a phone call about someone fighting his mother, "so what do you expect."

{¶ 46} And finally, after the shooting occurred, Jasmine testified that Jayse told her and Clark not to go home. A reasonable jury could infer that Clark's involvement with Jayse continued after the shooting had occurred.

{¶ 47} Clark has failed to demonstrate that there was insufficient evidence presented at trial to demonstrate that she was complicit with Jayse in the felonious assault shooting. Viewing the testimony in a light most favorable to the State, a reasonable jury could infer from Clark's actions prior to, during, and after the shooting, she aided and abetted Jayse in committing the felonious assault. Accordingly, Clark's second assignment of error is overruled.

### C. Manifest Weight

{¶ 48} In her third and final assigned error for review, Clark argues that her convictions were against the manifest weight of the evidence at trial.

### 1. Standard of Review

{¶ 49} In contrast to a sufficiency challenge, a challenge with respect to the weight of the evidence concerns """the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.""" *State v. Hughes-Davis,* 2025-Ohio-3151, ¶ 24 (8th Dist.), quoting *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 12, quoting *Thompkins,* 78 Ohio St.3d at 387. The Ohio Supreme Court has stated that when conducting a manifest weight review, the reviewing court "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the

evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.,* 2023-Ohio-4703, ¶ 14, citing *Eastley* at ¶ 20.

{¶ 50} In conducting this review, the Ohio Supreme Court noted that we must be mindful of the presumption in favor of the finder of fact and, "'[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Parma Hts. v. Brett,* 2025-Ohio-4, ¶ 21 (8th Dist.), quoting *Z.C.* at ¶ 14. The underlying rationale of giving deference to the findings of the finder of fact is that "the finder of fact is in the 'best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony.'" *State v. Jones,* 2025-Ohio-2866, ¶ 47 (8th Dist.), quoting *State v. Sheline,* 2019-Ohio-528, ¶ 100 (8th Dist.). As such, a manifest-weight-of-the-evidence challenge will be sustained "'"'only in the exceptional case in which the evidence weighs heavily against the conviction.'"'" *State v. Dodson,* 2025-Ohio-1733, ¶ 12 (8th Dist.), quoting *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### 2. Analysis

{¶ 51} Clark argues that the testimony of the victim's family who testified that they observed Jayse shooting at R.A.'s home is incredible, inconsistent, and contradicted by the physical evidence at the scene. Upon a thorough review of the

record, we cannot say that the jury clearly lost its way in finding Clark complicit with Jayse in the commission of this offense.

{¶ 52} It has been well recognized that "[i]nconsistencies or contradictions in a witness's testimony do not entitle a defendant to a reversal of a trial." *State v. Rentas,* 2024-Ohio-732, ¶ 16 (8th Dist.), citing *State v. Solomon,* 2021-Ohio-940, ¶ 62 (8th Dist.). Nor does the presence of conflicting testimony render a verdict against the manifest weight of the evidence. *State v. Pace,* 2025-Ohio-2874, ¶ 62 (10th Dist.). As a result, "a jury is free to accept or reject any or all the testimony of any witness." *State v. Cowen,* 2012-Ohio-3682, ¶ 54 (8th Dist.), citing *State v. Smith,* 2010-Ohio-4006, ¶ 16 (8th Dist.).

{¶ 53} Clark first challenges the credibility of R.A.'s and T.A.'s testimony. Clark alleges that R.A., the mother of J.S., was aggressively hostile with Clark's trial counsel when trial counsel confronted her with a video of the fight that occurred between R.A. and Clark at Bump Taylor Field earlier that day. Clark also alleges that R.A.'s testimony was inconsistent with her sister T.A.'s testimony concerning whether her family was inside or outside when Clark pulled up to R.A.'s house, prior to the shooting. Clark further calls T.A.'s testimony, that Jayse chased her around the vehicle while shooting, was "incredible."

{¶ 54} The jury was in the best position to judge the credibility of R.A.'s and T.A.'s testimony. They were in the best position to view R.A.'s alleged "hostile" behavior to defense counsel at trial. The jury was also free to accept or reject any or all of R.A.'s or T.A.'s testimony. The fact that there were inconsistencies between

the two witnesses does not render the verdict against the manifest weight of the evidence. *See Pace* at ¶ 62.

{¶ 55} Clark next alleges that the physical evidence, particularly the bullet casings fired from Jayse's gun, was not collected from directly in front of the house where a number of the witnesses testified that Jayse had been shooting from, rendering their testimony not credible. She also alleges that it was "incredible" that none of the witnesses observed a second shooter shooting towards Jayse since eight casings had been found in front of the porch of the house.

{¶ 56} We do not necessarily believe that this physical evidence renders the eyewitness testimony incredible. First, as soon as Jayse exited his vehicle and began firing, most of the witnesses testified that they turned around and ran. R.A. testified that when Jayse started firing, "we immediately start running in the house, and you just hear shooting everywhere." J.S. similarly testified that as soon as she heard the gunshots, "I turned around and ran." K.A. stated that when she heard the gunshots, she ran up the stairs. In light of this evidence, the jury could have rationally concluded that these witnesses had not seen a second person with a firearm. And even if they had, the jury was free to weigh that against each witness's credibility as it saw fit.

{¶ 57} Clark next claims that the casings fired from Jayse's gun were not found near the spot where the witnesses testified they had seen Jayse shooting from. Eighteen bullet casings fired from Jayse's gun were recovered on scene. Eight other casings recovered from the scene were fired from a separate firearm. The State

presented testimony from Kristen Koeth from the Cuyahoga County Regional Forensic Science Laboratory, Firearms and Toolmarks Unit. She testified that there are a number of variables that will affect where a cartridge case is going to land once it is ejected from a firearm. Where a casing is ultimately found is not necessarily the exact location from where the firearm was at the time of the shooting. As such, just because the casings were not found in the area where the witnesses saw Jayse shooting from, their credibility was not necessarily diminished. And again, even if it had, the jury was in the best position to determine the effect this had on the credibility of these witnesses' testimony.

{¶ 58} For these reasons, we cannot say that Clark's conviction for felonious assault was against the manifest weight of the evidence. Accordingly, Clark's third assignment of error is overruled.

### IV. Conclusion

{¶ 59} We affirm Clark's conviction for felonious assault. Viewing the instructions as whole, we find that the trial court's jury instructions concerning complicity were proper as a matter of law. We further find that the evidence presented at trial was sufficient and that a jury could reasonably determine that Clark aided and abetted Jayse in the commission of this crime. Finally, the conviction is not against the manifest weight of the evidence.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, A.J., and
MARY J. BOYLE, J., CONCUR